UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No: 14-cv-60545-MARRA

MEREDITH REDDING,

      Plaintiff

v.

NOVA SOUTHEASTERN UNIVERSITY, INC.
COLLEGE OF OSTEOPATHIC MEDICINE
and PATRICIO BRUNO, an individual,

      Defendants.

## DEFENDANT NOVA SOUTHEASTERN UNIVERSITY COLLEGE OF OSTEOPATHIC MEDICINE'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, Nova Southeastern University College of Osteopathic Medicine ("NSU" and "COM"), pursuant to Fed. R. Civ. P. 56 and S.D. Fla. Local Rule 56.1, files this Motion for Summary Judgment and Incorporated Memorandum of Law.

## UNDISPUTED FACTS

NSU will rely upon its Statement of Material Facts to which No Genuine Issue Exists simultaneously submitted with this motion.[1]

## MEMORANDUM OF LAW

### I. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if, viewing the evidence in the light most favorable to the party opposing the motion, there is no genuine issue to be tried. Fed. R.Civ.P. 56(c). See *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574 (1986). Only genuine disputes of fact that might affect the outcome of the suit under governing law will successfully defeat a motion

---

[1] All references to Defendant's Statement of Material Facts, which has been filed simultaneously herewith, will be made as "Facts" followed by the appropriate paragraph number(s).

for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat a motion for summary judgment in this Circuit, the non-moving party must provide more than a mere scintilla of evidence; summary judgment is proper if there are no genuine issues of material fact. *Earl v. Mervyn's, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). The Eleventh Circuit "urge(s) district courts to take a firm hand and whittle cases down to the few triable claims, casting aside the many nontriable ones … through summary judgment where there is no genuine issues of material fact." *Chapman v. AI Transp*, 229 F.3d 1012, 1027 (11th Cir. 2000). To withstand summary judgment, evidence must support finding for plaintiff based on more than "'mere speculation.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir.1994), quoting *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir.1985). As demonstrated below, there are no genuine issues of material fact that would support a verdict for the Plaintiff in this case.

**II. INTRODUCTION**

Plaintiff Meredith Redding alleges that NSU violated the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act because it failed to reasonably accommodate her disability and then dismissed her from the COM based upon that disability. The two counts of discrimination against NSU in the complaint do not identify the specific instances in which she was allegedly denied a reasonable accommodation. However, pursuant to discovery, her claims are based on (1) a failure to provide an accommodation relating to makeup exam flexibility and format during her first two academic years of medical school, and (2) a failure to provide a reasonable accommodation in relation to her participation in clinical rotations at Florida Hospital East Orlando ("FHEO"). The undisputed evidence demonstrates that Plaintiff was not subjected to discrimination while at NSU. Accordingly, summary judgment on Counts I and II should be granted.

**III.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND NSU IS ENTITLED JUDGMENT AS A MATTER OF LAW**

In order to establish a prima facie case of discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. sections 12101, et seq., or the Rehabilitation Act, 29 U.S.C.

sections 794, et seq.,[2] Plaintiff must demonstrate that (1) she has a disability as defined under the statute, (2) she is "otherwise qualified" for the benefit in question, and that (3) she was excluded from the benefit on the basis of her disability. *Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432, 435 (6th Cir. 1998); *Betts v. Rector & Visitors of Univ. of Va.*, 145 F. App'x 7, 10 (4th Cir. 2005). While NSU concedes that Plaintiff is "disabled," Plaintiff cannot show that she was "otherwise qualified" or that she was excluded from the program on the basis of her disability.

1. **Redding was not an "otherwise qualified" individual**

To state a cause of action under the ADA or Rehabilitation Act, Plaintiff must demonstrate that she is "otherwise qualified" to participate in the program with or without a reasonable accommodation. *See Kaltenberger*, 162 F.3d at 435. "[A] plaintiff bears the ultimate burden of persuasion with regard to whether he is qualified … to meet the educational institution's essential eligibility requirements with or without the aid of reasonable accommodations." *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1046 (9th Cir. 1999).

Courts have uniformly held that educational institutions are accorded significant deference with regard to the level of competency needed for an academic degree. *E.g., McGuinness v. University of New Mexico Sch. of Med,* 170 F.3d 974, 979 (10th Cir. 1998), *cert. denied,* 526 U.S. 1051 (1999); *Zukle*, 166 F.3d at 1947 (citing cases); *Haberle v. University of Alabama*, 803 F.2d 1536, 1540 (11th Cir. 1986)(stating that the judiciary is not suited to evaluate substance of academic decisions). The Supreme Court has made it clear that courts "should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate the person or committee responsible did not actually exercise professional judgment." *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985). As the Second Circuit has explained:

> In cases involving academic dismissal, educational institutions have the right to receive summary judgment unless there is evidence from which a jury could conclude that there was no rational basis for the decision [to dismiss] or that it was motivated by bad faith or ill will unrelated to academic performance.

---

[2] Courts apply the same legal standards to claims asserted under the Rehabilitation Act of 1974. 29 U.S.C. section 794(d). *See Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1132, *reh'g denied*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274 (1997); *Betts v. Rector & Visitors of Univ. of Va.*, 145 F. App'x 7, 10 (4th Cir. 2005).

*Clements v. Nassau County*, 835 F.2d 1000, 1004 (2d Cir. 1987).

Additionally, "great deference to a school's determination of the qualifications of a hopeful student" is appropriate "because courts are particularly ill-equipped to evaluate academic performance." *Davis v. Univ. of N.C.*, 263 F.3d 95, 101–02 (4th Cir. 2001) (dictum) (quoting *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 92, 98 (1978)) (internal quotation marks omitted). Evaluating performance in clinical courses "is no less an 'academic' judgment ... than assigning a grade to ... written answers on an essay question." *Horowitz*, 435 U.S. at 95, 98 (Powell, J., concurring). Courts "should only reluctantly intervene in academic decisions especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession. *Kaltenberger*, 162 F.3d at 437 (6th Cir. 1998)(quoting *Doherty v. Southern College of Optometry*, 862 F.2d 570, 576 (6th Cir.1988) (internal quotation marks omitted).

Redding is not an "otherwise qualified" individual as she was unable to successfully complete two clinical rotations which are essential components of the program. (Facts ¶¶ 29, 62, 77, 84, 87, 91). Clinical rotation is the primary focus during the final two years of osteopathic medical education, and it is undisputed that it is a critical and essential component of same. (Facts ¶ 62). In addition to having the ability and medical skill to perform medical treatment, students must also meet behavioral and professional requirements which are likewise essential components of clinical rotations, and the osteopathic medical program as a whole. (Facts ¶¶ 24, 28). Plaintiff's documented misconduct, professionalism concerns, and unauthorized absences during her clinical rotations rendered her not "otherwise qualified" to remain enrolled in the program. (Facts ¶¶ 69, 77, 79, 80). Since Plaintiff is not "otherwise qualified" for an essential portion of the program, she is not "otherwise qualified" for the entirety of the program.

The undisputed evidence is that Plaintiff received failing grades for two clinical rotations at Florida Hospital East Orlando ("FHEO"), which mandated her appearance before the College of Osteopathic Medicine's Student Progress Committee ("SPC"), and subjected her to potential discipline or dismissal. (Facts ¶¶ 29, 77). Dr. Patricio Bruno, Director of Medical Education ("DME") for FHEO, issued a failing grade for Plaintiff's July 2013 surgery rotation due to unauthorized absences, concerns about her emotional stability, a lack of appropriate boundary with a male medical student, and speaking out of context in front of patients. (Facts ¶¶ 69, 79). Dr. Bruno issued a failing grade for Plaintiff's pediatrics rotation because Plaintiff missed

multiple consecutive days of the rotation without authorization, including missing a presentation she was scheduled to give. (Facts ¶ 71).

Plaintiff's misconduct, lack of professionalism, and absenteeism all violated the "Core Performance Standards" for osteopathic medical students contained in the COM student handbook and the policies contained in the Clinical Training Manual. (Facts ¶¶ 23, 28). Plaintiff was aware of the program's policies and procedures and had agreed to abide by them by enrolling in the COM. (Facts ¶ 9). Plaintiff admits that she had unauthorized absences, that she never called her Dr. Bruno, or the NSU Office of Clinical Education relative to said absences, that she sent incoherent text messages to a resident, and that she had an inappropriate interaction with a male student. (Facts ¶ 90). Plaintiff only challenges that these events were never discussed with her or that they did not rise to a level that should subject her to discipline. (Facts ¶ 88). Dr. Bruno subsequently referred Plaintiff back to NSU for further evaluation and process. (Facts ¶ 80).

NSU policy mandates that students who fail two rotations, or who are dismissed from a rotation site, appear before the SPC for potential disciplinary action, including dismissal from the program. (Facts ¶ 29). Plaintiff subsequently appeared before the SPC, where the Committee considered the circumstances concerning her dismissal from FHEO. (Facts ¶ 82). Plaintiff was permitted to present evidence and additional information supporting her position as to why she should not face dismissal. (Facts ¶ 31).The SPC recommended, "based on Student Dr. Redding's failure of her first two rotations and matters of unprofessionalism, that she be immediately dismissed from the College of Osteopathic Medicine," which Dean Silvagni subsequently concurred with and affirmed. (Facts ¶¶ 84-87).

Plaintiff appealed the Dean's decision, challenging Dr. Bruno's ability to revise her evaluations subsequent to a preceptor's signature. (Facts ¶ 88-90). In her letter to the Appeals Committee, Plaintiff admitted to "inappropriate" behavior, and explicitly did not challenge the failing grade she received in her August 2013 pediatrics rotation. (Facts ¶¶ 88-90). She never made any allegation that Dr. Bruno's evaluations were discriminatory or related to her disability. (Facts ¶¶ 87-88). Further, Plaintiff has presented no evidence that the program's decision to dismiss her was pretextual, or that the program's decision was a bad faith exercise of its discretion to evaluate academic performance.

The decision to dismiss Plaintiff from the COM was not made lightly. Plaintiff was provided multiple layers of review, including an appearance before SPC, the Dean's consideration of the SPC's recommendation, and the Appeals Committee's review of the Dean's decision – all of which took steps to ensure that the allegations against Plaintiff were confirmed, appropriate policies were followed, and that Plaintiff's evaluations were not disability based or otherwise discriminatory. (Facts ¶¶ 82-93). The evidence establishes that this was clearly a rational decision reached after careful deliberation that cannot be characterized as "a substantial departure from accepted academic norms." *Regents of University of Michigan*, 474 U.S. at 225.

Plaintiff has offered <u>no evidence</u> that the evaluations made by Dr. Bruno, or the decisions made by the SPC, Dean Silvagni, or the Appeals Board had any relation to her disability. There is a complete absence of evidence from which a jury could conclude that there was no rational basis for the decision to dismiss Plaintiff, or that NSU or Dr. Bruno were motivated by bad faith or ill will unrelated to academic performance. Plaintiff's rotation experience demonstrates that she does not possess the requisite behavior and professionalism necessary for a clinical setting, which are essential elements of functioning as a medical student and ultimately as a physician.

## 2. There is no evidence that Redding was dismissed from the College of Osteopathic Medicine on the basis of her disability

Despite the overall similarity of the ADA and § 504 of the Rehabilitation Act, the language of the two statutes regarding the causative link between discrimination and adverse action is significantly dissimilar. Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" by specified entities. 29 U.S.C.A. § 794(a) (emphasis added). In contrast, the pertinent language of the ADA prohibits discrimination against an individual "on the basis of disability." 42 U.S. Code § 12182 (emphasis added). Plaintiff cannot meet the burden of either standard.

Plaintiff was held to the same behavioral and professionalism standards as all NSU students participating in a clinical rotation. (Facts ¶¶ 8, 23, 28, 35). The only evidence in the record indicates that Plaintiff was dismissed from NSU due to the failure of two clinical rotations, in connection with unauthorized absences, inappropriate behavior, and unprofessionalism. (Facts ¶¶ 77-80, 84-87, 91-93). Plaintiff has not demonstrated that her

clinical rotation evaluations or subsequent dismissal were based on anything other than academic judgment, which is subject to great judicial deference as described above. Further, Plaintiff has shown absolutely no evidence indicating that her dismissal from NSU was related to her disability in any way.

**IV. NSU DID NOT DENY REDDING REASONABLE ACCOMMODATIONS**

In the higher education context, a plaintiff alleging failure to accommodate under Title III of the ADA or Section 504 of the Rehabilitation Act must establish that she: (1) is disabled; (2) is "otherwise qualified" academically; and (3) requested a reasonable accommodation that would not fundamentally alter the nature of the defendant's service. *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006). The Supreme Court has held that § 504 of the Rehabilitation Act requires that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). The meaningful access standard to ensure an equal opportunity is consistent with the purpose of Title III of the ADA, which is to ensure that all people have "full and equal enjoyment" of public accommodations regardless of disability. 42 U.S.C. § 12182(a); *Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013). The ADA defines "discrimination" to include "a failure to make reasonable modifications" that are "necessary" to "to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

While NSU acknowledges that Plaintiff is disabled, she is not "otherwise qualified" academically as detailed above. Further, Plaintiff never requested a reasonable accommodation that would not fundamentally alter the nature of the osteopathic medicine program, nor were her requested accommodations necessary. (Facts ¶¶ 5, 51, 54-57, 61). Plaintiff was never denied meaningful access to the benefit of the osteopathic medicine program. (Facts ¶ 61).

1. **Didactic years (M1/M2)**
    a. ***Redding did not request reasonable accommodations until October 2012***

In Plaintiff's Complaint, the only specific requested accommodation alleged to have been denied was to "be allowed to take a make-up exam, similar to the one that she missed." (Facts ¶ 5). It is undisputed that in October 2012, Plaintiff formally submitted a request for disability accommodations and supporting documentation to the NSU Office of Student Disability Services in accordance with NSU policy. (Facts ¶ 51). However, prior to October 2012, Plaintiff never requested disability accommodations in accordance with written NSU policy. (Facts ¶ 49).

A disabled student's disregard of written procedures can be fatal to her subsequent discrimination claim. *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1231 (S.D. Fla. 2010). Plaintiff acknowledged that she was aware of the policies contained in the NSU COM Student Handbook requiring students to be familiar with all policies contained therein. (Facts ¶¶ 7-9). The specific policies state that "[s]tudents are required to be familiar with the rules, policies, and Code of Student Conduct and Academic Responsibility;" "[f]ailure to read this handbook does not excuse students from the rules, policies, and procedures contained within the student handbook, including any revisions or modifications;" and "[s]tudents are expected to be familiar and comply with all the policies and procedures contained within the student handbook." (Facts ¶ 7).

The policies detailing the procedure for students to request disability accommodations are clear and unambiguous, and are conspicuously detailed throughout the NSU COM Student Handbook. (Facts ¶¶ 10-11). The handbook also provides the name of the University's ADA coordinator as well as the phone number and location of the NSU Office of Student Disability Services. (Facts ¶ 11). It is undisputed that the NSU disability policies written described above were in effect at the time of Plaintiff's matriculation to NSU, and remained in effect throughout her participation in the program. (Facts ¶ 34).

Plaintiff claims that she sought disability accommodations prior to 2012 via an e-mail she allegedly sent from her own personal Gmail account to the personal Hotmail e-mail account of Raymond Ferrero III, HPD Executive Director for Intramural Health Affairs, on March 17, 2011, wherein she requests a meeting "to discuss her circumstances" and how to complete the needed requirements to be "placed under the ADA act." (Facts ¶ 45). Plaintiff was well aware of NSU's policy requiring the use of assigned NSU e-mail accounts for any official NSU business, yet inexplicably alleges to have sent her March 17, 2011 e-mail from her personal Gmail account to Mr. Ferrero's personal Hotmail account. (Facts ¶¶ 9, 15, 45). NSU has no control over third-

8

party e-mail services, nor does it have the ability to access or audit such e-mail accounts. The NSU e-mail policy exists specifically to avoid situations such as the instant scenario. Additionally, Mr. Ferrero never instructed Plaintiff to contact him via his personal e-mail account, and was unable to locate a copy of the e-mail when informed of its alleged existence. (Facts ¶¶ 46-47).

Regardless, Plaintiff clearly did not follow the clear and unambiguous policies concerning requesting disability accommodations contained in the student handbook. Additionally, Plaintiff's alleged e-mail to Mr. Ferrero does not actually disclose any disability, nor does it identify or request any accommodation. (Facts ¶ 45). The burden is on the student to both disclose her disability and make a case for specific accommodation. *Forbes*, 768 F. Supp. 2d at 1231. Once the existence of the March 17, 2011 e-mail was made known to NSU in 2012, the COM immediately engaged in the interactive process and directed Plaintiff to the Student Disability Services website to ensure that she was absolutely aware of the policies and procedures associated with requesting disability accommodations. (Facts ¶ 50). The Student Disabilities website contains the same policies that are detailed in the Student Handbook, and also contains the requisite forms and documentation guidelines. (Facts ¶ 12). In October 2012, Plaintiff, for the first time, submitted a request for disability accommodations and supporting documentation in accordance with NSU policy, and ultimately received reasonable accommodations which included extra time on written exams and frequent bathroom breaks. (Facts ¶¶ 58-60). It is clear that any hardship Plaintiff had in seeking accommodations arose from her own failure to follow NSU's clearly defined procedures.

### b. *Redding was provided with a reasonable accommodation when disability accommodations were requested in accordance with written NSU policy*

It is undisputed that in October 2012, Plaintiff, for the first time, formally submitted a request for disability accommodations and supporting documentation to the NSU Office of Student Disability Services in accordance with NSU policy. (Facts ¶¶ 49, 51). The specific accommodations Plaintiff requested at that time were: "If absent from scheduled exam due to illness with valid doctor/hospital documentation, be allowed to take make-up exam in same format as original exam" and "If absent from make-up exam under similar conditions, be allowed to sit for the make-up exam at a later date (no penalty acquired)." (Facts ¶ 51).

9

NSU does not guarantee a student their specific requested accommodations, nor is it required to under the law. Assuming, arguendo, that Plaintiff is a qualified individual with a disability, she is still "not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). COM administration asked that Plaintiff's September 2012 requested accommodations be re-evaluated due to the undue hardship they would place on the COM both administratively and financially, and because they would represent a fundamental alteration of the program by permitting Plaintiff to dictate the date and format of her makeup exams.[3] (Facts ¶¶ 53-57).

Plaintiff's requested accommodations and supporting documentation were then returned to the Office of Student Disability Services to determine whether there was an alternative means of accommodating Plaintiff's disability without creating an undue hardship, a fundamental alteration of the program, or a lowering of academic standards. (Facts ¶¶ 53-57). Plaintiff's medical documentation only advised that Plaintiff suffers from Crohn's disease and provided a general description of the symptoms of the disease. (Facts ¶ 55). The medical documentation did not make any recommendations concerning proposed accommodations. (Facts ¶ 55). Based upon the documentation provided by her physician, the Office of Student Disability Services approved Plaintiff with accommodations of extra time on written exams (x1.5), and permission to take frequent bathroom breaks during class and exams. (Facts ¶¶ 58-59). Courts must give deference to professional academic judgments when evaluating the reasonable accommodation requirement. *See McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 859 (5th Cir.1993). Given the content of Plaintiff's medical documentation, both the NSU Office of Student Disability Services and the COM felt that such accommodations were reasonable and that they would accommodate her disability.

Additionally, NSU's disability accommodation policies contain an appeal mechanism to ensure that students have appropriate due process in connection with the denial of any accommodation. (Facts ¶ 14). The policies and procedures concerning appeals of disability accommodations are contained directly in the "Procedures and Agreement for Specialized Services" form, which Plaintiff herself signed. (Facts ¶ 14). It is undisputed that Plaintiff knew about the comprehensive appellate process which was available to her, but never chose to take

---

[3] See section IV(1)(c) below.

advantage of it or challenge the approved accommodations until the filing of the instant lawsuit. (Facts ¶¶ 14, 59-60).

### c. *Redding's requested accommodations would have placed an undue administrative and financial burden on NSU and would fundamentally alter the program*

Federal law mandates that federal grantees and public accommodations make "reasonable," but not "substantial" or "fundamental," modifications to accommodate persons with disabilities. See *Alexander*, 469 U.S. at 300. A modification "is not reasonable if it either imposes undue financial and administrative burdens ... or requires a fundamental alteration in the nature of the program." *Sch. Bd. v. Arline*, 480 U.S. 273, 287 n. 17 (1987) (citation omitted) (quoting *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410 (1979) (internal quotation marks omitted). Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is "reasonable on its face, i.e., ordinarily or in the run of cases," or if the defendant establishes as a matter of law that the proposed modification will cause "undue hardship in the particular circumstances." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002).

Courts must also give deference to professional academic judgments when evaluating the reasonable accommodation requirement. See *McGregor*, 3 F.3d 850 at 859; *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir.1992). If an educational institution submits undisputed facts demonstrating that relevant officials within the institution considered alternative means of accommodation, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation. *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 26 (1st Cir. 1991).

Without any supporting evidence, Plaintiff concludes that Plaintiff's requested accommodations "cost NOVA nothing." However, the undisputed evidence reflects that permitting Plaintiff to take make-up exams at a later date, and in a different format than other students taking the make-up exams, would subject NSU to a significant financial and

administrative burden, and would result in preferential treatment for Plaintiff. (Facts ¶¶ 54, 57). Faculty members spend a significant amount of time and resources in creating multiple-choice exams. (Facts ¶ 54).

Although courts must review schools' compliance with the law requiring them to make accommodations for students with disabilities, the format in which the school chooses to assess its students is well within the school's discretion. *Singh v. George Washington Univ. Sch. of Med. & Health Sciences*, 597 F. Supp. 2d 89, 96 n. 6 (D.D.C. 2009) aff'd, 667 F.3d 1 (D.C. Cir. 2011). In the instant matter, NSU has presented unrefuted evidence that, if either of Plaintiff's proposed accommodations were granted, NSU faculty would be subjected to the undue hardship of spending a significant amount of time creating, not only a second, but potentially a third exam for each of Plaintiff's courses. (Facts ¶ 54). Due to the unpredictable nature of Plaintiff's Crohn's "flare-ups" faculty members would not be able to anticipate Plaintiff's absence and would not be aware that an alternate makeup-exam is necessary until the exam was actually offered. (Facts ¶ 54). Given Plaintiff's academic history, her request to take make-up exams at a later date could delay her make-up exams by weeks, or even months.

Plaintiff's requested accommodations would also fundamentally alter the nature of the osteopathic medicine program. (Facts ¶¶ 53, 56). Her requested accommodations would permit her to dictate not only the format of her makeup exams, but the actual date in which they are offered. (Facts ¶ 57). These benefits are not available to any other students in the COM and would provide Plaintiff with an unfair advantage. (Facts ¶¶ 56-57). Plaintiff's requested accommodations would permit her to advance to a course prior to the successful completion of a prerequisite course. (Facts ¶ 57). They would also require faculty members to wait indefinitely until Plaintiff was ready to take a make-up exam. (Facts ¶ 56). The indefinite duration and uncertain likelihood of success of a proposed accommodation renders it unreasonable. *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012). The Rehabilitation Act and ADA do not obligate a school to permit a student to continue in an educational program with the hope that at some unknown time in the future she will be able to satisfy the program's essential requirements. *Id*. at 466. Placing such a requirement on NSU is not required under the law.

    d.   *Redding's requested accommodations were not necessary*

{00312739.DOCX. 1 }

Even if Plaintiff did properly request disability accommodations prior to September 2012, they clearly were not necessary. Under Title III of the ADA, a place of public accommodation need not make a reasonable modification unless it is necessary to provide an individual with a disability full and equal enjoyment of its goods, services, facilities, privileges, advantages, or accommodations. *Murphy v. Bridger Bowl*, 150 F. App'x 661, 663 (9th Cir. 2005); 42 U.S.C. § 12182(b)(2)(A)(ii). Section 504 of the Rehabilitation Act requires that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." *Alexander*, 469 U.S. at 301. It naturally follows that when an individual already has "meaningful access" to a benefit to which he or she is entitled, no additional accommodation, "reasonable" or not, need be provided by the grantee. *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 680 (E.D.N.Y. 2012) *aff'd sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 F. App'x 95 (2d Cir. 2013).

In the employment context, courts have held that accommodations are not necessary when an employee is able perform the essential functions of their position without them. *E.g., Konieczny v. New York State Div. of Parole*, 647 F. Supp. 2d 256, 264 (W.D.N.Y. 2009); *Kintz v. United Parcel Serv., Inc.*, 766 F. Supp. 2d 1245, 1257 (M.D. Ala. 2011). In the instant litigation, the benefit sought by Plaintiff was the continued participation in the didactic portion of the osteopathic medicine program. Despite not receiving the specific accommodations she requested (i.e. ability to take make-up exams at a later date and in the same format as the initial offering), Plaintiff was able to successfully meet the academic requirements and ultimately complete the didactic years of her medical education (M1 and M2) successfully once granted the accommodations of extra test time and frequent bathroom breaks. As such, the accommodations Plaintiff claims she was denied were not necessary, and Plaintiff cannot show that she was denied meaningful access to the osteopathic medicine program.

Plaintiff's requested accommodation relating to taking make-up exams at a later date was not necessary because NSU COM policies adequately addressed her issues. Students in the osteopathic medicine program are provided with a great deal of flexibility concerning their ability to take exams. (Facts ¶¶ 19, 37-39). Students are essentially given four attempts to sit for an exam including (1) the initial offering of the exam, (2) a make-up of the exam, (3) a remediation exam, and (4) a make-up of the remediation exam. (Facts ¶ 19). It is also undisputed

that Plaintiff was also permitted to take two medical leaves of absence without academic penalty and was allowed a reduced course load. (Facts ¶¶ 38-39).

Plaintiff alleges that NSU denied her request to "be allowed to take a make-up exam, similar to the one she missed," which resulted in her "being forced to take an essay exam that continuously resulted in lower grades, as well as the inability to be part of the normal grade curve available to students that took the regular examinations." (Facts ¶ 5). As with Plaintiff's request for "make-up exam flexibility," her request to take exams in the same format as the original offering was not necessary. COM policy permits *any* student to miss the initial offering of an exam for *any* reason without penalty. (Facts ¶ 16). Plaintiff's Complaint contains no specific allegations that the policy itself, or the format of makeup exams is discriminatory. The complaint merely alleges that the denial of permission to take the make-up exams in the same format as they were originally offered somehow "continuously resulted in lower grades, as well as the inability to be part of the normal grade curve available to students that took the regular examinations." (Facts ¶ 5).

While Plaintiff did experience some difficulties with make-up exams, Plaintiff has submitted no evidence demonstrating that such exams are punitive or more challenging than the initial exams, other than her own anecdotal failures and perception of increased difficulty. Plaintiff has also submitted no evidence that suggests that disabled students are disparately subjected to make-up exams. On the contrary, the unrefuted evidence demonstrates that the COM goes through great lengths to ensure that there is parity in difficulty between the initial exams and make-ups, regardless of the format. (Facts ¶¶ 21-22). Make-up exams are specifically reviewed in conjunction with the original exam offering to ensure that the questions are based on the same material, and that the level of difficulty remains equal. (Facts ¶¶ 20-22).

As such, there is no evidence in the record to support the argument that the NSU COM makeup exam policy has a disparate impact on individuals with disabilities. Plaintiff's contention that short-answer or essay exams are more difficult than multiple choice exams is not supported by any evidence, and is directly contradicted by unrefuted evidence indicating that the difficulty levels between initial exams and make-ups are equal, even if the formats are different. (Facts ¶ 22). Furthermore, Plaintiff has provided no evidence that her disability, Crohn's disease, is in any way connected to her request to take make-up exams in a particular format. Permitting

Plaintiff to take make-up exams in her preferred format would provide her with an unfair advantage that is not available to any other student. (Facts ¶ 57).

The applicable policies concerning make-up exam dates and format were applied uniformly to all students. (Facts ¶ 35). Additionally, Plaintiff was granted two medical leaves of absence and was permitted to carry a reduced course load. (Facts ¶¶ 38-39). Plaintiff's requested accommodations were unnecessary, because she was not denied full and equal access to the osteopathic medicine program, which is evident by her successful completion of the didactic portion of the program. (Facts ¶ 61).

### e. *Redding's alleged denied accommodation had no bearing on her dismissal from program*

Assuming, *arguendo*, that NSU did improperly deny Plaintiff her requested accommodations, the denial of such ultimately had no connection whatsoever to her dismissal from the program. (Facts ¶¶ 69-74, 77-93). As indicated above, Plaintiff was able to successfully complete the didactic years of her medical education, and was only dismissed due to her failures of two clinical rotations, based on attendance, behavioral and professionalism concerns. (Facts ¶¶ 61, 69-74, 77-93). She has not alleged, nor presented any evidence connecting the denial of a reasonable accommodation during her didactic years to her ultimate dismissal from the program.

### 2. Clinical Rotations (M3)
#### a. *Redding never requested an accommodation for clinical rotations*

The initial burden is on the student to request disability accommodations and provide supporting documentation. *Forbes*, 768 F. Supp. 2d at 1231. By the time Plaintiff enrolled in clinical rotations in July 2013, there can be no dispute that she had actual knowledge of the appropriate procedures for seeking disability accommodations, since she had already gone through the process and received disability accommodations in late 2012. (Facts ¶¶ 50-51, 59). Plaintiff was also aware that her approved disability accommodations did not automatically extend to her clinical rotation site. (Facts ¶ 59). The "Procedures and Agreement for Specialized Services" form which Plaintiff signed in connection with her 2012 accommodations specifically states that: "The granting of accommodations by the NSU Health Professions Division in no way

guarantees that accommodations will be granted by outside entities (rotation sites, testing boards, etc.) and it will be the student's responsibility to request accommodations." (Facts ¶ 59).

The duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made. *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir.1999). Plaintiff never sought additional or modified disability accommodations pursuant during her clinical rotations. Plaintiff's Complaint does not contain any allegation that Plaintiff ever attempted to obtain disability accommodations from anyone during her participation in clinical rotation. To date, Plaintiff has never identified a potential reasonable accommodation that would remedy the misconduct, behavioral, and attendance issues upon which her dismissal was based. A school cannot provide any service, modification or accommodation when it does not know one is required. It is a student's responsibility to make their disability-related needs known in advance, which Plaintiff did not do.

Plaintiff alleges that "NOVA either failed to inform Dr. BRUNO of REDDING's need for accommodation due to her disease, or informed Dr. BRUNO and allowed Dr. BRUNO to continue failing to provide REDDING with any type of accommodation." Plaintiff has provided no evidence that there was any duty for NSU to disclose her "need for accommodation" to Dr. Bruno. Even if NSU informed Dr. Bruno of Plaintiff's approved disability accommodations from NSU, her approved disability accommodations only related to modifications concerning written exams and testing, which are not components of the clinical rotation experience. (Facts ¶¶ 51, 59). The accommodations that Plaintiff claims she was denied (make-up exam flexibility and multiple choice questions on make-up exams) would also have had no impact on her clinical rotation or the evaluation she received from Dr. Bruno. (Facts ¶¶ 5, 51, 62, 69-74, 77-80). The only accommodations *ever* sought by Plaintiff from NSU related only to testing, and therefore would not impact on her ability to participate in a clinical rotation in any way.

> **b. Redding has not shown any reasonable accommodation which would remedy the issues upon which her dismissal was based**

The burden rests on the plaintiff to show the availability of a reasonable accommodation which, if granted by the defendant, would have enabled her to meet all the program's requirements. *el Kouni v. Trustees of Boston Univ.*, 169 F. Supp. 2d 1, 4 (D. Mass. 2001). To date, Plaintiff has not explained how her previously approved accommodations would have

permitted her to satisfy the behavioral, professionalism, and attendance deficiencies upon which her failure of the clinical rotations, and ultimate dismissal, was based, nor has Plaintiff demonstrated the existence of *any* reasonable accommodation which would rectify said issues.

## V. CONCLUSION

For the multitude of reasons cited above, summary judgment should be granted in favor of NSU. Plaintiff's ultimate dismissal from the College of Osteopathic Medicine was purely an academic decision based on her absenteeism, behavioral and professionalism deficiencies, all of which were wholly unrelated to her disability. (Facts ¶¶ 69-74, 77-93). Plaintiff has not presented any evidence suggesting that her dismissal was, in any way, related to her disability. Further, Plaintiff has provided no evidence that she ever sought any disability accommodations from anyone concerning her participation in clinical rotations at FHEO.

Plaintiff contends that she was denied a reasonable accommodation throughout her M1 and M2 years of the osteopathic medicine program, yet was able to complete said years successfully without the accommodations she alleges to have been denied. (Facts ¶ 61). Plaintiff was aware of written NSU policies and procedures concerning disability accommodations, but continuously ignored them. (Facts ¶¶ 9-15, 49, 59-60). When Plaintiff finally submitted her request for disability accommodations and supporting documentation pursuant to NSU policy, she received reasonable accommodations. (Facts ¶ 59). While Plaintiff claims that the granted accommodations "were not really accommodations," she did nothing to appeal the denial of the specific accommodations she requested, despite the accommodations appeal procedure being expressly detailed in the very document she signed granting her accommodations. (Facts ¶ 14, 60).

While NSU recognizes that Plaintiff suffers from a severe and debilitating disability in the form of Crohn's disease, the record in this matter is devoid of any evidence supporting Plaintiff's claim that she was discriminated against on the basis of her disability. Her dismissal from the program was based solely on her own behavior and conduct.

WHEREFORE, for the reasons set forth above, NSU respectfully requests this Honorable Court to grant its motion as set forth above.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the   5th   day of June, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing as indicated by asterisk.

PANZA, MAURER & MAYNARD, P.A.
Counsel for Defendant
Nova Southeastern University
Bank of America Building, Third Floor
3600 North Federal Highway
Fort Lauderdale, FL  33308
Phone: (954)390-0100, Fax: (954)390-7991

By: /s/Richard A. Beauchamp
RICHARD A. BEAUCHAMP, ESQ.
Fla. Bar No.: 471313
E-Mail: rbeauchamp@panzamaurer.com

## SERVICE LIST

Meredith Redding v. Nova Southeastern University, Inc. College of Osteopathic Medicine &
Patricio Bruno
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No: 14-60545-CV-MARRA

**Shawn L. Birken, Esq.**
**Counsel for Plaintiff**
**Law Offices of Shawn L. Birken, P.A.**
**100 S.E. 3rd Avenue, Suite 1300**
**Ft. Lauderdale, Florida 33394**
**E-Mail: sbirken@birken-law.com**
**\*Service through CM/ECF Electronic Filing**

**Joyce Ackerbaum Cox, Esq.**
**Counsel for Defendant, Patricio Bruno**
**Baker & Hostetler, LLP**
**2300 SunTrust Center**
**200 South Orange Avenue**
**Post Office Box 112**
**Orlando, FL 32802**
**E-mail: jacox@bakerlaw.com**
**\*Service through CM/ECF Electronic Filing**


**Salomon Laguerre, Esq.**
**Counsel for Defendant, Patricio Bruno**
**Baker & Hostetler, LLP**
**2300 SunTrust Center**
**200 South Orange Avenue**
**Post Office Box 112**
**Orlando, FL 32802**
**E-mail: slaguerre@bakerlaw.com**
**\*Service through CM/ECF Electronic Filing**