UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 14-60545-CIV-MARRA/MATTHEWMAN

MEREDITH REDDING,

      Plaintiff,

vs.

NOVA SOUTHEASTERN UNIVERSITY, INC.,
COLLEGE OF OSTEOPATHIC MEDICINE, et al.,

      Defendants.

_____/

## OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      This matter is before the Court on Defendant Nova Southeastern University, Inc. College of Osteopathic Medicine's ("Nova") Motion for Summary Judgment (DE 68), which is ripe for review. For the following reasons, the Court partially grants Nova's motion and also orders Plaintiff's counsel to show cause regarding a potential violation of Federal Rule of Civil Procedure 11(b).

## I. Facts[1]

      Meredith Redding sues Nova for alleged violations of Title III of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12182 (2012)[2] and Section 504(a) of the Rehabilitation

---

[1] The following facts are undisputed or, where disputed, viewed in the light most favorable to Redding, the nonmoving party. Citations to depositions refer to the pagination of the deposition and all other citations refer to the pagination in the CM/ECF header of the cited document. For brevity, the Court cites only one party's statement of facts for a factual proposition where the opposing party indicated in its corresponding response or reply that the alleged fact is undisputed.

[2] In her complaint and summary judgment response, Redding refers to Title III of the ADA and 42 U.S.C. § 12132. (*E.g.*, DE 37 ¶ 1; DE 80 ¶ 1.) This is clearly a mistake. Section 12132 is part of Title II of the ADA, not Title III. Title II applies to public entities. Title III applies to places of public accommodation and is codified at 42 U.S.C. §§ 12181–12189. The Court construes Redding's ADA claim as solely a Title III claim because nothing in the complaint suggests Nova is a public entity and Redding alleges that "Nova is a private university." (DE 37 ¶ 7).

Act of 1973, 29 U.S.C. § 794(a) (2012). Redding claims that Nova violated these statutes by failing to provide her with reasonable accommodations during her enrollment in Nova's osteopathic medicine program and by ultimately dismissing her from the program.

### A. 2009-2010 Academic Year

Redding, a former student in Nova's osteopathic medicine program, suffers from Crohn's disease. (DE 68-1 ¶¶ 2–3.) Her condition requires frequent hospitalizations and medical treatment. (*Id.* at ¶ 3.) During the first semester of her second year at Nova, Redding was hospitalized multiple times due to her Crohn's disease or side effects from her medication.[3] (DE 99 ¶ 99.) These hospitalizations caused her to miss many exams. (DE 70-2 at 56:2–59:10, 81:22–82:25.)

Under Nova's exam policy, a make-up exam may be in short-answer, essay, or multiple-choice format at the instructor's discretion, and a failure to attend a make-up exam results in receiving a zero for that exam. (DE 68-10 at 18; DE 68-11 at 5.)[4] There are no excused absences for a make-up exam, even if missed due to illness or hospitalization.[5] (DE 73-1, Ex. G at 38:2–17, 122:6–123:20.) The student handbook states that make-up exams are required to be given within ten

---

[3] Nova simultaneously disputes that Redding suffered from side effects while stating it is undisputed that her Crohn's disease *or side effects of her medication* caused her hospitalizations. (*Compare* DE 100 ¶ 96, *with id.* at ¶ 99.) The Court resolves the ambiguity in favor of Redding, the nonmovant.

[4] Nova submitted the 2008-2009 and 2013-2014 student handbooks, but not the 2009-2010 student handbook, which would contain the policies applicable to Redding's first attempt of her second academic year. The Court assumes that the relevant 2008-2009 policies remained the same in the 2009-2010 academic year because Redding has not challenged Nova's citations to the 2008-2009 student handbook, nothing in the record suggests the relevant policies changed, and this assumption does not prejudice Redding as it only affects a claim on which the Court denies Nova summary judgment.

[5] There appear to be other opportunities to pass a course if a student misses a make-up exam, but the record is conflicting and undeveloped as to their availability and academic consequences.

business days after the original exam, but it also states that "[m]ake-up examinations for exams missed due to acute student illness . . . may be given at the discretion of the course director *at any time* during the academic year." (DE 68-10 at 18; DE 68-11 at 5) (emphasis added).

After taking her first make-up exam during the 2009-2010 academic year, Redding realized the make-up exams were more difficult than the original exams. (DE 70-2 at 57:11–59:10, 62:12–63:10.) In particular, the make-up exams were given in essay or short answer format while the original exams were given in multiple-choice format. All of Redding's make-up exams were in a different format than the original exam. (*Id.* at 63:22–64:1.) Also, because a semester was composed of successive "blocks" of courses and the make-up exams were scheduled after a new block of courses had already started, Redding became mired in a cycle of falling behind in her new courses while studying for make-up exams and then taking additional make-up exams in the new courses. (*Id.* at 81:22–82:25.) She would then be hospitalized and miss additional exams, perpetuating the cycle. (*Id.* at 81:22–82:25.) While Redding missed some exams due to her Crohn's flare ups and hospitalizations, she also chose to miss others and opt for the make-up exam because she was unprepared due to studying for another make-up exam. (*Id.* at 81:22–82:25, 84:1–85:25.) Ultimately, the majority of Redding's exams this semester were make-up exams. (*Id.* at 81:22–82:25, 83:21–25.)

The student handbook states that to initiate a request for academic accommodations a student should contact the "disability service representative" for the student's particular school. (DE 68-8 at 42.) To obtain the name and contact information of the student's disability service representative, the student should contact the university's ADA coordinator. (*Id.*) When Redding called the ADA coordinator to tell her about the impact of her Crohn's disease on her ability to take exams and to

3

ask about what accommodations were possible, the ADA coordinator told Redding that she could

not help her and directed her back to the medical school. (DE 70-2 at 69:24–71:5.) It appears the

ADA coordinator did not tell Redding the name and contact information of the disability service

representative for osteopathic medicine students.

Throughout this semester, Redding also repeatedly sought help from Dean of Students Dr.

Albert Whitehead regarding her hospitalizations, the make-up exams, and her growing concerns

about failing the make-up exams. (*Id.* at 56:10–57:16, 61:9–15, 65:1–10, 62:9–63:17, 69:24–70:7,

72:10–14, 79:2–9.) At several of these meetings, Redding specifically requested to take her make-up

exams in the same format as the original exam and to reschedule some of her make-up exams at the

end of the semester to prevent the "cascading effect" of make-up exams causing her to fall behind,

leading to additional make-up exams. (*Id.* at 64:14–22, 86:1–18.) At each meeting, Dr. Whitehead

told Redding that he could not help her and that she would have to take the make-up exams.[6] (*Id.* at

56:10–57:10, 64:10–13, 72:10–73:7.) Under Nova's policies, if a student seeks accommodations

from a faculty member or administrator, the faculty member or administrator should refer the student

to the Office of Student Disability Services, which handles requests for disability accommodations.

(DE 73-1, Ex. G at 10:10–25; DE 79-1, Ex. AA at 23:12–21.) Dr. Whitehead never mentioned

Nova's disability accommodation policy to Redding.[7] (DE 70-2 at 65:11–14.)

---

[6] To the extent Nova claims that Redding's testimony regarding what Nova faculty or administrators told her is hearsay, Nova fails to explain how such statements would not be admissible under Federal Rule of Evidence 801(d)(2)(D).

[7] Nova disputes this alleged fact and several others on the ground that Redding "relies solely on her uncorroborated and self-serving deposition testimony to support this assertion." (DE 100 ¶ 104.) There is no rule of evidence that renders a party's testimony inadmissible simply because it is self-serving and uncorroborated. Most testimony from a party (including Nova) is self-serving. So long as the testimony is based on personal knowledge, is a statement of fact rather than a conclusory

On one occasion this semester, Nova permitted Redding to reschedule a make-up exam. After Dr. Whitehead refused Redding's request to postpone a make-up exam because she had just recently been discharged from the hospital, Redding met with Vice-Dean Dr. Lawrence Jacobson. (*Id.* at 68:19–69:11, 73:8–74:6.) After telling Dr. Jacobson of her hospitalization and Dr. Whitehead's refusal to let her take the make-up exam at a later date, Dr. Jacobson said that it was "ludicrous" for Redding to be forced to take the scheduled make-up exam and that he would check if Redding could take the exam at a later date. (*Id.* at 74:7–18.) Later, Dr. Jacobson informed Redding that Dr. Anthony Silvagni, Dean of the College of Osteopathic Medicine, would allow her to take the exam at a later date. (*Id.* at 74:7–23; DE 68-18 at 4.)

According to Redding, on the night before one of her make-up exams, the course director called Redding and told her that Nova's make-up exams are purposefully more difficult and "are made to fail." (DE 70-2 at 57:11–59:10, 60:1–6.) Redding claims that the course director told her 11 of the 14 topics that would be tested and said, "This is the only way you will pass this test. Please don't speak to the [College of Osteopathic Medicine] about it." (*Id.* at 57:11–59:10.) Redding then wrote down the topics and they "match[ed] exactly to the test questions." (*Id.* at 59:19–25.) Redding received an 89 percent on this make-up final, which was the only make-up exam in the College of Osteopathic Medicine that Redding ever passed. (*Id.* at 60:7–12.)

At the end of her fall semester, Dr. Whitehead told Redding that she had failed so many make-up exams that she was in danger of failing out of school and that she needed to withdraw from

---

allegation, and is otherwise admissible, it is adequate summary judgment evidence. While Nova may make its arguments to a jury, they are groundless on summary judgment. Because Nova fails to cite any *evidence* to rebut Redding's testimony, the Court considers this fact (and others where this is Nova's sole dispute) to be undisputed. *See* S.D. Fla. L.R. 56.1(b).

the semester to avoid the risk of failing her remaining exams and failing out of school. (*Id.* at 80:10–13, 81:1–7, 87:21–88:14.) Dr. Whitehead offered Redding a decelerated course load for the next semester, meaning she could register for half of the courses, audit the remaining courses for non-credit, and later retake her first semester courses and the audited second semester courses for credit. (DE 68-18 at 3.) Redding agreed to withdraw from the semester and take a decelerated course load the next semester. (DE 70-2 at 88:15–89:17.) Redding did not need to take any make-up exams during the next semester and finished that semester with a B plus average. (*Id.* at 91:7–12.)

### B. 2010-2011 Academic Year

Redding began her re-attempt at her second academic year in August or September 2010.(DE 37 ¶¶ 19–20; DE 39 ¶¶ 19–20; DE 70-2 at 91:4–12.) Again, Redding began missing classes, exams, and make-up exams due to flare-ups and other complications caused by her Crohn's disease. (DE 70-2 at 92:7–18, 93:19–95:5–17.) Redding was also hospitalized for several days. (*Id.* at 92:16–93:13.)

By this semester, Dr. Whitehead had been replaced by Dr. Hilda De Gaetano. (*Id.* at 110:22–111:12). Redding had several meetings and telephone conversations with Dr. De Gaetano. (*Id.* at 111:3–12, 112:25–113:15.) Redding told Dr. De Gaetano that she was failing and needed help, but Dr. De Gaetano told Redding that she did not have the power to help her. (*Id.* at 112:25–113:15.) According to Redding, Dr. De Gaetano also told Redding that the make-up exams were in a different format as a punishment and a deterrent. (*Id.* at 96:13–18, 99:20–100:2.)

In December 2010, Redding missed her Gastrointestinal and Respiratory make-up exams due to her illness. (DE 37 ¶ 24; DE 39 ¶ 24; DE 70-2 at 103:21–104:15.) Redding failed her Respiratory course for missing the make-up exam. (DE 37 ¶ 26; DE 39 ¶ 26; DE 70-2 at 103:5–104:15.) Dean

6

Silvagni did, however, permit Redding to reschedule her Gastrointestinal make-up exam and take it in its original multiple-choice format. (DE 70-2 at 103:13–105:6.)

During the next semester, in February 2011, Redding was hospitalized for 12 days. (*Id.* at 107:2–9.) Because of this hospitalization, Redding was going to miss several finals and make-up exams, which would result in failing the courses for that block. (*Id.* at 107:10–18.) Executive Associate Dean Dr. Elaine Wallace placed Redding on medical leave so she would not fail the block. (*Id.* at 105:10–107:23, 114:2–20.) When Redding returned from the hospital, she asked Dr. Wallace about taking multiple-choice exams, but Dr. Wallace told her that she could only offer her medical leave. (*Id.* at 108:1–12, 115:13–22.) Dr. Wallace also said, "You need to speak to Raymond Ferrero, our attorney. We're going to try to get you set up with accommodations. This needs to happen." (*Id.*) Dr. Wallace gave Redding the option of returning to school, but Redding chose to remain on medical leave because of her health and the accumulation of make-up exams. (*Id.* at 108:1–19)

On March 17, 2011, Redding sent an email to Raymond Ferrero, the Executive Director for Intramural Health Affairs. (DE 68-1 ¶ 45; DE 68-5 at 17–18.) In this email, Redding told Mr. Ferrero, "I'd very much like to meet with you at your convenience to discuss my circumstances and how to complete the needed requirements to be placed under the ADA act." (DE 68-5 at 17–18.)[8] Redding also claims she called Mr. Ferrero twice and left him a voice message, but he never

---

[8] Nova notes that Redding sent this email from her personal email account to Mr. Ferrero's personal email account, rather than use Nova's official email accounts. Nova claims its student handbook requires the use of a Nova-assigned email account for all electronic communication between students and faculty or administrators. Nova does not explain why this is relevant, but regardless Nova fails to support this assertion because it fails to provide the 2010-2011 student handbook. Of Nova's citations to the record, only one page of the 2013-2014 student handbook supports such a requirement. (DE 68-12 at 119.) In the same section of the 2008-2009 student handbook, the sentence containing the requirement is absent. (DE 68-10 at 110–11.) Accordingly, Nova fails to support its assertion that this requirement existed in March 2011 when Redding sent this email.

responded to her calls or email. (DE 70-2 at 115:23–116:5.)

C. **2011-2012 Academic Year**

Redding ended her medical leave and began her third attempt at her second academic year in the fall of 2011. (*Id.* at 110:5–18.) Redding did not have any significant medical issues and did not need to take any make-up exams this semester. (*Id.* at 123:20–124:21.)

At the beginning of the next semester, in January 2012, Redding missed several exams due to an issue unrelated to her Crohn's disease. (*Id.* at 125:13–16, 142:4–143:9.) By this time, Nova's policy changed to allow students to take their make-up exams at the end of the semester rather than within ten business days of the original exam. (*Id.* at 142:13–20.) Halfway through taking one day's make-up exams, Redding left for the emergency room based on her doctor's advice. (*Id.* at 124:24–125:7, 141:15–142:6.) Redding told Dr. Wallace that she needed to go to the hospital and asked to reschedule her make-up exams. (*Id.* at 143:10–144:3.) According to Redding, Dr. Wallace screamed at her, "No you're not. I'm failing you on all of them. You're going to get dismissed from school. I'm sending you to the Student Progress Committee." (*Id.* at 143:10–144:24.) Redding failed all her courses for the semester, which totaled 15 credit hours. (*Id.* at 144:25–145:19.)

Pursuant to Nova's policy, a failure of more than 14 credit hours in a single academic year subjects a student to potential dismissal from the program. (DE 68-1 ¶ 42.) The Student Progress Committee makes recommendations to the dean, but the decision to dismiss a student is ultimately made by the dean. (*Id.* at ¶ 30.) A student may appeal the dean's decision to the College of Osteopathic Medicine Appeals Board, whose decisions are final. (*Id.* at ¶ 32.)

In May 2012, Redding appeared before the Student Progress Committee, which recommended that Redding be dismissed from the program for failing more than 14 credit hours in

a single academic year. (*Id.* at ¶¶ 41, 43.) Dean Silvagni concurred with this recommendation. (*Id.* at ¶ 43.) Redding appealed and told the Appeals Board that she was disabled due to Crohn's disease, had sought accommodations for her disability, and had emailed Mr. Ferrero seeking information about disability accommodations. (*Id.* at ¶¶ 44, 45.) Although Mr. Ferrero searched his personal email account and was unable to locate any email from Redding, the Appeals Board voted to overturn Dean Silvagni's decision and allow Redding to return to the program. (*Id.* at ¶¶ 46, 48.)

### D. 2012-2013 Academic Year

When Redding returned to school in September 2012, Dr. Margaret Wilkinson, Nova's Associate Dean for Preclinical Education, summoned Redding to review Nova's policies and procedures for applying for disability accommodations. (DE 68-1 ¶ 50; DE 79-1, Ex. Z at 5:22–24.) On October 17, 2012, Redding applied for disability accommodations with the Office of Student Disability Services. (DE 68-1 ¶ 51.) On her student intake form, Redding requested: (1) "If absent from scheduled exam due to illness (Crohn's disease) with valid doctor/hospital documentation, be allowed to take make-up exam in the same format as original exam," and (2) "If absent from make-up exam under similar conditions, be allowed to sit for the make-up exam a[t] a later date (no penalty acquired)." (DE 68-2 at 19.) Along with her student intake form, Redding submitted a letter from her doctor detailing the issues that she could have because of her Crohn's disease. (DE 99 ¶ 126.) This letter did not identify any recommended disability accommodations, but Redding's doctor did write, "Please let me know if further details are needed." (DE 68-2 at 22.)

In October 2012, based on Redding's submission, the Health Professions Division of the Office of Student Disability Services granted Redding's requested accommodations. (DE 68-2 at 23–26; DE 79-1, Ex. Z at 62:3–6, 66:18–21; DE 99 ¶ 127; DE 100 ¶ 127.) Specifically, the following

accommodations were granted: (1) "Student will be granted bathroom breaks during class and exams (no additional time will be added)"; (2) "Student will be granted reasonable flexibility with make-up exams (physician's note required)"; and (3) "Student will be given multiple choice questions when possible rather than long essay questions, when possible [sic]." (DE 68-2 at 24.) On October 17, 2012, Redding signed a Procedures and Agreement for Specialized Services form, which indicated her agreement with these accommodations. (*Id.*) On October 25, 2012, the Health Professions Division of the Office of Student Disability Services issued a "Memorandum of Accommodation" again listing the granted accommodations. (*Id.* at 25.)

The documents from the Office of Student Disability Services granting Redding's requested accommodations state that "to complete the accommodations process" the student must meet with her school's ADA representative, identified as Dr. Wilkinson, and that "[a]ccommodations will not commence" until the student does so. (*Id.* at 23–24.) The Memorandum of Accommodation lists the granted accommodations and states: "The student has been asked to hand deliver this 'Memo of Accommodations' to the college's ADA Representative in order to receive the college's policy and procedure for the implementations of the accommodations." (*Id.* at 25.) None of the documents granting Redding's requested accommodations, however, state that the grant is preliminary, temporary, proposed, or otherwise subject to further approval by the student's respective school. (*Id.* at 23–25.) In fact, the Office of Student Disability Services has the final say regarding the appropriateness of a requested accommodation and has the power to grant accommodations, even over the disagreement of the dean of a particular school. (DE 79-1, Ex. AA at 42:1–44:8, 48:13–21.)

On October 25, 2012, the Office of Student Disability Services notified Dr. Wilkinson via email of the "granted accommodations due to [Redding's] documented disability." (DE 79-1 at 26.)

Generally, the granted accommodation from the Office of Student Disability Services is "time and a half" for written exams. (DE 79-1, Ex. Z at 16:10–17:4.) If notified of a granted accommodation that is beyond "time and a half" or being in a room with other people who have an accommodation, Dr. Wilkinson's protocol was to notify Dr. Wallace or Dean Silvagni because they may want to question the accommodation. (*Id.* at 16:10–17:22.) In other words, "[w]hen an accommodation that's granted [wa]s outside the usual standard one," Dr. Wilkinson would make sure that Dean Silvagni or Dr. Wallace reviewed it. (*Id.* at 71:16–24.) Dr. Wilkinson brought the accommodations to the attention of Dr. Wallace, who in turn informed Dean Silvagni. (DE 73-1, Ex. G at 16:17– 17:14.)

The process by which the accommodations were changed is somewhat unclear, but on November 15, 2012, the Health Professions Division of the Office of Student Disability Services issued a new Memorandum of Accommodation that listed different accommodations than those listed on the October 25, 2012 Memorandum of Accommodation. (DE 68-2 at 27.) The new granted accommodations were: (1) "Student will be granted extra time for written exams (x1.5)"; and (2) "Student will be granted bathroom breaks during class and examinations." (*Id.*) Redding never requested these accommodations. (DE 70-2 at 98:9–99:2.) The two Memoranda of Accommodation differed in other ways as well. For example, the initial Memorandum of Accommodation contained a paragraph stating: "Upon thorough review of the physician's evaluation, the student has submitted the documentation required by Nova Southeastern University's Student Disability's [sic] Office for the granting of the following accommodations . . . ." (DE 68-2 at 25.) This paragraph is absent from the new Memorandum of Accommodation. (*Id.* at 27.)

Redding was not told of the change in accommodations until months later, in February 2013. (DE 70-2 at 172:13–173:3, 173:16–175:22.) According to Redding, Dr. Wilkinson ignored her

11

during the fall semester when she tried to have Dr. Wilkinson sign the original Memorandum of Accommodation. (*Id.* at 173:16–174:23.) Redding did not miss any exams during her fall 2012 semester, however, so she did not need to use the accommodations. (*Id.* at 173:7–9.)

On February 19, 2013, Redding went to Dr. Wilkinson's office regarding the accommodations she believed had been granted. (*Id.* at 173:16–175:22.) Dr. Wilkinson then showed Redding the new Memorandum of Accommodation, which Redding had never seen, and told Redding to sign the new documentation. (*Id.*) When Redding protested, Dr. Wilkinson allegedly told Redding that she had to sign it or she would not be allowed to take her exams. (*Id.* at 173:16–176:13.) According to Redding, Dr. Wallace was also present at this meeting and told Redding that Nova did not have to grant her requested accommodations because the school could put Redding on medical leave whenever she got sick. (*Id.*) Redding then signed a new Procedures and Agreement for Specialized Services form, listing the new accommodations. (DE 68-1 ¶ 59; DE 68-2 at 28.) Despite the appeal process being expressly detailed in the form that she signed, Redding never attempted to appeal the new accommodations. (DE 68-1 ¶ 60.)

Following this meeting, Redding missed some exams due to her Crohn's disease and needed to take make-up exams. (DE 70-2 at 166:10–167:12, 172:7–12, 173:7– 24.) Redding took her make-up exams in essay format, rather than the original multiple-choice format, and failed. (DE 70-2 at 166:10–167:12, 173:7–15.) Nevertheless, Redding completed the second academic year of her curriculum and advanced to the third year. (DE 68-1 ¶ 61.)

**E. 2013 Clinical Semester**

The third year of Nova's osteopathic medicine program consists of clinical rotations, which are essential to the program. (*Id.* at ¶ 62.) In July 2013, Redding began her clinical rotations at

Florida Hospital East Orlando. (*Id.* at ¶ 63.) She was scheduled for a surgery rotation in July 2013 and a pediatrics rotation in August 2013. (*Id.* at ¶ 67.) Residents at the hospital directly supervise medical students. (*Id.* at ¶ 68.) Dr. Patricio Bruno, who had a faculty appointment from Nova, was the Director of Medical Education at the hospital during Redding's rotations. (*Id.* at ¶¶ 64–65.)

Throughout Redding's participation in clinical rotations, Dr. Bruno did not know of Redding's disability. (*Id.* at ¶ 81.) The Office of Student Disability Services Procedures and Agreement for Specialized Services form, which Redding previously signed, stated: "The granting of accommodations by the NSU Health Professions Division in no way guarantees that accommodations will be granted by outside entities (*rotation sites*, testing boards, etc.) and it will be the student's responsibility to request accommodations." (DE 68-2 at 28) (emphasis added).[9]

The conduct and professionalism requirements in Nova's student handbook are essential components of Nova's osteopathic medicine program. (DE 68-1 ¶ 24.) The 2013-2014 student handbook states that osteopathic medicine students "are expected to adhere to behavior consistent with the high standards of the medical profession" and that "inappropriate conduct will not be tolerated." (DE 68-12 at 129.) The student handbook explains that it is "not possible to enumerate all forms of inappropriate behavior," but certain inappropriate behavior "could raise significant questions concerning a student's ability to continue in the academic program." (*Id.*) The student handbook also states that inappropriate or unprofessional behavior may result in dismissal. (*Id.* at 131.) Redding was aware of all the policies in the student handbook. (DE 68-1 ¶ 9.)

---

[9] Dr. Wilkinson sent Nova's Director of Clinical Education a list entitled, "Accommodated Students—M3 Clinical Year," which named Redding and noted she was "allowed time and a half for written exams and bathroom breaks as needed during class and exams." (DE 79-1 at 34.) The list only notes the accommodations and does not state Redding's disability or suggest she is prone to absences. There is no evidence this list was sent to anyone at Florida Hospital East Orlando.

Nova's code of conduct incorporates by reference the attendance policy described in the College of Osteopathic Medicine Clinical Training Manual, which is a supplement to the student handbook relating specifically to third- and fourth-year students participating in clinical rotations. (*Id.* at ¶ 27; DE 68-12 at 130.)  Regarding attendance, the Clinical Training Manual provides:

> In the event of an unexcused absence, including an absence due to emergency, sudden illness, or whenever approval cannot be obtained, the college's Office of Clinical Education must be notified immediately of the emergency situation. A written explanation from the student must be sent to the college's Office of Clinical Education, as well as the site's DME, and preceptor, as soon as possible. When applicable, supporting documentation must be included with the explanation.
>
> Students are permitted two days of **excused** absence **from any one month** of a given rotation. . . . Anticipated days of absence must be cleared with the preceptor and DME (if applicable) at the rotation site. The Office of Clinical Education must also be notified of the excused day(s) of absence.
>
> ***
>
> Any absence not reported to the Office of Clinical Education within one business day will result in disciplinary action.

(DE 68-14 at 5.) Florida East Hospital Orlando had a similar written policy that required students to notify Dr. Bruno's secretary, the preceptor, and the resident in charge of hospital service regarding any absences due to illness. (DE 70-3 at 125:5–126:23; DE 70-11 at 3.) Before beginning her clinical rotations, Redding was aware of these policies. (DE 68-1 ¶ 66; DE 70-3 at 123:16–124:3.)

During Redding's clinical rotations, Dr. Bruno received reports from supervising residents that, during Redding's surgery rotation, Redding exhibited frequent tardiness; had unauthorized absences from lectures, didactics, and rotations; spoke out of context in front of patients thus undermining the team's care; exhibited a lack of appropriate boundaries (including exhibiting inappropriate boundary issues of a sexual nature toward a male resident); sent incoherent text messages and made incoherent phone calls to a resident; exhibited unprofessionalism; and lacked

14

accountability. (DE 68-1 at ¶ 69.)[10] Any one of these reports would have potentially been grounds for failure or dismissal from a rotation. (*Id.* at ¶ 70.)[11] While Redding disputes that some of these instances of misconduct occurred, she admits that she had absences in excess of the maximum allowable, sent incoherent test messages to a resident, missed a lecture that she was supposed to give, and inappropriately patted a resident on the head. (*Id.* at ¶ 90.)

Regarding her surgery rotation absences, Redding admits she was absent for two days due to her Crohn's disease.[12] (DE 99 ¶ 69.) Redding claims that on July 1, 2013, the first day of orientation for clinical rotations, Dr. Bruno's secretary told her that anytime she is absent she should call her supervising resident, Dr. Brian Ware, instead of her preceptor, Dr. Kenley Davis. (DE 70-3 at 126:15–19, 131:3–24.) Redding was absent from her surgery rotation on July 2 and 3, 2013 due to her Crohn's disease and notified Dr. Bruno's secretary and Dr. Ware of her absences. (*Id.* at 127:16–128:10, 134:7–14.) On July 3, 2013, Dr. Bruno's secretary sent Redding an email with the

---

[10] Redding disputes that Dr. Bruno received these reports during her *surgery* rotation. It is clear that Dr. Bruno received these reports sometime during Redding's rotations and it is immaterial whether this was during or after the surgery rotation. Redding also disputes that some of the incidents reported to Dr. Bruno occurred, but none of her citations to the record rebut Nova's record-supported assertion that Dr. Bruno received these reports. Regardless, in ruling on Nova's motion the Court only considers the instances of unprofessional conduct that are undisputed.

[11] Redding states that she disputes this assertion, but her only stated dispute is that "[t]he reports did not happen." (DE 99 ¶ 70.) This does not rebut Nova's record-supported assertion that the reported behaviors, if true, would be grounds for dismissal or failure.

[12] Redding claims she worked three unscheduled days "to make up the time" and notes that Dr. Ware's initial evaluation indicated she was absent for zero days. (DE 99 ¶ 69.) Dr. Ware states Redding "had at least 3 absences, if not more, during her surgical rotation," and that he wrote zero absences "because residents are typically more lenient and sympathetic on their evaluations of the students than the doctors higher up on the hierarchy." (DE 70-8 ¶ 12.) Redding's extra days and Dr. Ware's notation of zero absences are immaterial. It is undisputed that Redding was absent from her surgery rotation for at least two days and never sought proper authorization for these absences.

subject line "Sick" that said, "I hope you contacted Dr. Davis or Mayra Renta, Office Manager about you being out sick. Below is information of Dr. Davis. Hope you get well." (DE 70-4 at 4.) Dr. Davis's phone number and email address are included in the email. (*Id.*) Redding admits she read this email the next day, but still never contacted Dr. Davis. (DE 70-3 at 128:21–23, 132:3–133:20.)

Redding was also absent from her pediatrics rotation for several days due to a Crohn's flare up and negative effects of her medication. (DE 68-1 at ¶ 71; DE 99 at ¶ 71.)[13] While absent, Redding contacted resident Dr. Jayde George, who told her that she sounded incoherent and should not see patients. (DE 37 ¶ 48; DE 39 ¶ 48; DE 70-6 at 18:2–19:10; DE 99 ¶ 71.) Dr. George allegedly told Redding, "I'll take care of everything." (DE 70-6 at 19:3–6.) Redding did not contact anyone else regarding these absences. Redding never notified the Office of Clinical Education of any absences from her clinical rotations, and she never provided Dr. Bruno or the Office of Clinical Education a written explanation of her absences. (DE 68-1 at ¶¶ 73–74.)[14]

As Director of Medical Education at the hospital, Dr. Bruno would prepare medical student evaluations by obtaining evaluations from multiple sources, including residents, attending physicians, and sometimes other supervisors. (*Id.* at ¶ 75.) He would then review and edit them. (*Id.*) At times, Dr. Bruno would make a comprehensive evaluation for a medical student's rotation performance. (*Id.*)[15] Dr. Bruno has seven years of experience as a Director of Medical Education,

---

[13] While Redding attempts to dispute some portions of Nova's statement of fact, none of her record citations rebut Nova's record-supported assertion that Redding was absent multiple days.

[14] Redding attempts to dispute this fact by listing individuals that she did notify. (DE 99 ¶ 73.) None of these individuals, however, worked in the Office of Clinical Education.

[15] Redding attempts to dispute Dr. Bruno's role in the evaluation of students, all of which Nova adequately supports with citations to the record, but the only evidence Redding cites to support this dispute is her testimony regarding her understanding of the evaluation process, which is immaterial.

during which he has overridden a supervising physician's evaluation several times. (*Id.* at ¶ 76.)[16]
Though Redding's initial evaluations for her surgery rotation were passing, Dr. Bruno overrode these
evaluations and gave her a failing grade. (DE 99 ¶ 77.)

Redding ultimately received failing grades for both of her rotations from Dr. Bruno. (DE 68-1
at ¶ 77.)[17] Dr. Bruno felt that Redding was unfit for clinical rotations. (*Id.* at ¶ 78.)[18] Dr. Bruno cited
unauthorized absences, concerns about Redding's emotional stability, lack of appropriate boundaries
with a male medical student, and instances of speaking out of context in front of patients as reasons
for failing Redding on her surgery rotation. (*Id.* at ¶ 79.) Due to Redding's behavior, Dr. Bruno had
concerns about Redding, patient safety, and the dynamics of residents and students. (*Id.* at ¶ 80.)

Under Nova's policies, students who fail two rotations appear before the Student Progress
Committee for potential discipline, including dismissal from the program. (*Id.* at ¶ 29.) On August
16, 2013, Redding appeared before the Student Progress Committee. (*Id.* at ¶ 82.) The Student

---

[16] Redding responds that this assertion is "disputed," but she only addresses assertions in this
paragraph unrelated to Dr. Bruno's experience. She attempts to dispute Nova's record-supported
assertion that Dr. Bruno has overridden a supervising a physician's evaluation several times by citing
Dr. Bruno's testimony that "[i]t doesn't happen too often" and Dr. Wallace's testimony that it was
"unusual." (DE 99 ¶ 76.) These statements do not contradict Dr. Bruno's testimony that he has
overridden a supervising physician's evaluation "several times." (DE 70-1 at 24:10–13.) Nor does
the testimony Redding cites regarding alleged "inconsistencies" in Dr. Bruno's evaluations.

[17] Redding attempts to create a dispute with non-conflicting evidence. Redding argues that Dr. Bruno
changed the initial evaluations on her surgery rotation to create a failing evaluation. (DE 99 ¶ 77.)
This fails to rebut, and actually concedes, the fact that Redding ultimately received failing grades
from Dr. Bruno. Furthermore, though Redding states Nova's entire assertion is "disputed," she
addresses only her surgery rotation and fails to address the pediatrics rotation. (*Id.*)

[18] Again, Redding claims to dispute this fact, but offers no conflicting evidence. She disputes this
fact because Dr. Bruno was unaware of her disability, was worried about her "mental stability," and
based "a majority of the percent" of his decision to send Redding back to Nova on his perception of
Redding's emotional instability. (DE 99 ¶ 78.) If anything, these additional facts support, not refute,
Nova's assertion that Dr. Bruno felt that Redding was unfit for clinical rotations.

Progress Committee ultimately voted to dismiss Redding from Nova, citing the failure of her first two rotations and matters of unprofessionalism. (*Id.*; DE 79-1 at 60–61.) On September 5, 2013, Dean Silvagni concurred with the Student Progress Committee's recommendation. (DE 68-1 ¶ 86). On September 23, 2013, Redding submitted a written appeal of her dismissal to the Appeals Board, which voted to uphold the dismissal. (*Id.* at ¶¶ 88, 91.)

## II.  Legal Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It must do so by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If the burden of persuasion lies with the nonmovant, summary judgment may be granted where the movant either negates an essential element of the nonmovant's claim or demonstrates to the Court that the nonmovant's evidence is insufficient to establish an essential element of that claim. *Celotex*, 477 U.S. at 331. Any doubt regarding whether a trial is necessary must be resolved in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

After the movant meets its burden of production, this burden shifts to the nonmovant. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts or materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

18

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmovant's evidence cannot "consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Where the nonmovant bears the burden of persuasion, it must produce more than a mere scintilla of evidence supporting its position; "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. Discussion

#### A. "Qualified Individual" Element

Redding's claims can be separated into two categories: those based on Nova's decision to dismiss Redding ("dismissal claims") and those based on Nova's denial of Redding's accommodation requests regarding make-up exams ("failure-to-accommodate claims"). Redding brings both categories of claims under Title III of the ADA and Section 504(a) of the Rehabilitation Act. Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of . . . any place of public accommodation . . . ." 42 U.S.C. § 12182(a). Section 504(a) of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

Whether Redding is a "qualified individual" is a threshold inquiry for all of her claims. Section 504(a) of the Rehabilitation Act expressly contains the "qualified individual" element. 29 U.S.C. § 794(a). Unlike Titles I and II, Title III of the ADA does not contain the phrase "qualified individual." *Compare* 42 U.S.C. §§ 12112(a), 12132, *with* 42 U.S.C. § 12182(a). Nevertheless, courts have consistently held that a Title III ADA plaintiff must prove that he or she is "qualified"

when the public accommodation at issue is available to only qualified members of the general public. *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 154 (1st Cir. 1998); *Shepherd v. U.S. Olympic Comm.*, 464 F. Supp. 2d 1072, 1090–91 (D. Colo. 2006), *aff'd sub nom.*, *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191 (10th Cir. 2008); *cf. PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675–76 (2001) ("At issue now, as a threshold matter, is the applicability of Title III to petitioner's golf tours and qualifying rounds, in particular to petitioner's treatment of a *qualified* disabled golfer wishing to compete in those events." (emphasis added)). Congress's directive that the ADA "shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act" quells any reason to find significance in Title III's omission of the phrase "qualified individual." 42 U.S.C. § 12201(a).[19]

Under both the ADA and Rehabilitation Act, an individual is "qualified" for a program if she can meet the essential eligibility requirements for participation in the program, either with or without reasonable accommodations. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012); *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998). This raises two inquiries: (1) whether the requirements imposed on the individual are essential, and (2) whether the individual can meet them, either with or without reasonable accommodations.

On this record, there is no genuine factual dispute that the requirements at issue—meeting professionalism standards (including complying with the clinical rotation attendance policy) and not failing two clinical rotations—were essential to Nova's osteopathic medicine program. Redding

---

[19] Moreover, not to impose the "qualified individual" requirement on Title III ADA plaintiffs in the academic context would lead to the absurd result of the requirement depending solely on whether the student is suing a public university (which is covered under Title I) or a private university. There is no reason to believe that Congress intended the ADA to apply to students at private universities who were not "qualified," while limiting it to only qualified students at public universities.

concedes that the conduct and professionalism requirements delineated in the student handbook, which incorporate the attendance policy described in the Clinical Training Manual, are essential components of the osteopathic medicine program. (DE 68-1 ¶ 24.) While there is no specific concession in the record that not failing two clinical rotations is an essential requirement of the osteopathic medicine program, Redding concedes that clinical rotations in general are essential to the program and that under Nova's policies failing two clinical rotations is a basis for dismissal. (*Id.* at ¶¶ 29, 62.) Also, deference should be given to an educational institutions's judgment regarding the qualifications necessary for participation in its program. *Wood v. President & Trs. of Spring Hill Coll.*, 978 F.2d 1214, 1222–23 (11th Cir. 1992). Given this deference, Redding's concessions, and Redding's failure to challenge the essentialness of the requirement to not fail two clinical rotations, the Court considers the essentialness of this requirement to be undisputed.

There is also no genuine factual dispute that Redding failed to meet essential requirements of Nova's osteopathic medicine program. First, it is undisputed that Redding failed, multiple times, to meet the essential requirement of complying with Nova's attendance policy for clinical rotations (which also violated the code of conduct). Redding's claim that Dr. Bruno's secretary told her to deviate from the *Florida East Hospital Orlando* attendance policy is immaterial to her failure to comply with *Nova*'s policy. Nova's attendance policy for clinical rotations requires notification of an absence due to illness to be made to the Office of Clinical Education, the Director Medical Education, *and* the preceptor, with particular emphasis placed on notification of the Office of Medical Education. (DE 68-14 at 5). No one at Florida East Hospital Orlando would have authority to override *Nova*'s policy for clinical rotations. Even if someone did, at best the alleged instructions from Dr. Bruno's secretary replaced the requirement to notify the preceptor with a requirement to

notify Dr. Ware. This did not affect the *additional* requirements, with which Redding never complied, to notify the Office of Clinical Education of the absence and to provide a written explanation of the absence to Dr. Bruno and the Office of Clinical Education.

Second, it is undisputed that Redding did not meet the essential requirement of not failing two clinical rotations. Redding argues that her initial evaluations for her surgery rotation were passing until "altered" by Dr. Bruno, but this is irrelevant. As Dr. Bruno had the ultimate authority over whether a student passed or failed a rotation, the requirement of not failing two clinical rotations necessarily depended on satisfying Dr. Bruno's academic and professional judgment. Another third party's opinion, including the opinion of another physician who lacked ultimate authority over Redding's grade, is immaterial. *Ellis v. Morehouse Sch. of Med.*, 925 F. Supp. 1529, 1544–45 (N.D. Ga. 1996) (Hull, J.) ("At any rate, the most Ellis's evidence shows is that Drs. Kroger and Walker disagreed in their evaluations of Ellis's performance. However, Dr. Kroger, as Course Director for the fourth-year Surgery course, had the ultimate responsibility for assigning Ellis a grade in his fourth-year Surgery course.") If Nova's requirement is not to receive two failing grades, only the opinion of the person who assigns grades is relevant to whether Redding met the requirement.

Redding claims Dr. Bruno's decision to fail her was improperly motivated. In *Regents of the University of Michigan v. Ewing*, the Supreme Court held that judges should show "great respect" for a faculty's professional judgment when reviewing a genuinely academic decision and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." 474 U.S. 214, 225 (1985) (footnote omitted). While *Ewing* was a due process case, the Court's reasoning in its discussion of judicial review of academic decisions is adaptable to other contexts. The factors

22

motivating the Court's reasoning— principles of academic freedom and courts' lack of expertise to evaluate academic decisions—are not tethered to the due process context. *See id.* at 226–27 & n.12.

In the disability discrimination context, the First Circuit has held that the *Ewing* standard should be modified as it relates to the "reasonable accommodation" analysis, but otherwise "the same principle of respect for academic decisionmaking applies." *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25–6 (1st Cir. 1991) (en banc).[20] Other circuits agree. *See, e.g.*, *Kaltenberger*, 162 F.3d at 436; *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 817 (9th Cir. 1999) (Kravitch, J.).[21] The Eleventh Circuit does not appear to have explicitly decided *Ewing*'s applicability to disability

---

[20] In his dissent, then-Chief Judge Breyer agreed with the majority's view on the applicability of *Ewing* and only disagreed with the majority's application of the law to the facts of the case. *Wynne*, 932 F.2d at 29–30 (Breyer, C.J., dissenting). Thus, *Wynne* was unanimous on the issue of *Ewing*'s applicability to judicial review of academic judgments in the disability discrimination context.

[21] In one case, the Seventh Circuit *seemingly* took a contrary view, but the decision actually supports the same deference the Court applies here. In *Novak v. Board of Trustees of Southern Illinois University*, the Seventh Circuit stated that "the *Ewing* formulation has been determined to be inappropriate in cases based on the Nation's discrimination statutes," but it also recognized that academic judgments are often necessarily subjective and that "courts must understand the nature and mission of [academic] institutions and evaluate the evidence accordingly" in discrimination cases. 777 F.3d 966, 976 (7th Cir. 2015). The *Novak* court cited *Wynne* with approval as a case that recognized the "distinction between the proper treatment of academic decisions in the discrimination context versus the substantive due process context." *Id.* Read in context, and consistent with *Wynne*'s *modified* adaptation of *Ewing* in the disability discrimination context, the Court reads *Novak* as approving the grant of some level of deference to subjective academic evaluations without, of course, cloaking academic institutions with immunity from antidiscrimination laws. Indeed, the prior Seventh Circuit cases upon which *Novak* relies support this interpretation. *E.g.*, *Blasdel v. Nw. Univ.*, 687 F.3d 813, 815–17 (7th Cir. 2012) (noting that "although the legal standard is the same . . . practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight—notably the absence of fixed, objective criteria for tenure at that level" and that plaintiff could prevail only with evidence that prejudice influenced the adverse decision); *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998) ("Congress did not intend that institutions of higher learning enjoy immunity from the Nation's antidiscrimination statutes. However, we must not second-guess the expert decisions of faculty committees in the absence of evidence that those decisions mask actual but unarticulated reasons for the University's action.").

discrimination cases, but *Wynne* is consistent with current Eleventh Circuit law. *Cf. Wood*, 978 F.2d at 1222–23 (holding, in disability discrimination context, that academic institutions are entitled to deference in their determination of qualifications for their programs).

The deference the Court gives to Dr. Bruno's decision is not a rubber stamp. *Halpern*, 669 F.3d at 463 ("[W]e must take care 'not to allow academic decisions to disguise truly discriminatory requirements' . . . ."); *Wong*, 192 F.3d at 817 ("This deference is not absolute . . . ."). Dr. Bruno's decision must be a "genuinely" academic decision and cannot be used to conceal impermissible reasons for his decision. *See Ewing*, 474 U.S. at 225. As previously noted, Nova's requirement that a student not fail two rotations necessarily depends on Dr. Bruno's *academic* judgment. In other words, if Dr. Bruno's decision to assign Redding failing grades was improperly motivated rather than based on his academic judgment, then (putting aside Redding's failure to also meet the essential requirement of complying with Nova's attendance policy) there might be a factual question as to whether Redding failed to meet the essential requirement of not failing two rotations.

On this record, Redding fails to demonstrate that Dr. Bruno's decision was improperly motivated. Dr. Bruno cited unauthorized absences and matters of unprofessionalism as reasons for failing Redding. While Redding disputes the factual basis of some of the alleged instances of unprofessionalism, she concedes that some did occur and that she had multiple unauthorized absences during both of her rotations. Dr. Bruno's unrebutted testimony makes clear that unauthorized absences alone, or any other alleged instance of unprofessionalism alone, could be grounds for failure of a rotation. (DE 68-1 ¶¶ 69–70.)[22] Certainly then, multiple unauthorized

---

[22] As noted *supra*, Redding claims to dispute this in her response statement of facts, but she only raises disputes about the underlying allegations that she engaged in certain instances of unprofessionalism and does not specifically dispute (or cite evidence supporting a dispute) that such

absences combined with the conceded instances of unprofessionalism subjected Redding to failure. Accordingly, there is no genuine issue of fact that Dr. Bruno's decision to fail Redding was within his discretion and academic judgment as the Director of Medical Education.

Again, Redding's claim regarding Dr. Bruno's secretary does not excuse her violation of Florida East Hospital Orlando's attendance policy. This policy required students to notify Dr. Bruno's secretary, the preceptor, and the resident in charge of hospital service regarding any absences due to illness. (DE 70-3 at 125:5–126:23; DE 70-11 at 3.) Even accepting Redding's version of events as true, it is undisputed that *after* Redding's alleged conversation with Dr. Bruno's secretary, Dr. Bruno's secretary sent Redding an email advising her to notify her preceptor, Dr. Davis, of her absence due to her illness. Redding never did. The email from Dr. Bruno's secretary negated any alleged prior instruction not to notify the preceptor. Redding's multiple failures to notify her preceptor of her absences, even after advised to do so by Dr. Bruno's secretary, violated the hospital's attendance policy for clinical rotations and subjected Redding to failure.

Redding also points to alleged inconsistences as to why she failed her rotations and the fact that it was unusual for Dr. Bruno to override another physician's evaluation as evidence of "pretext." Redding cannot establish that Dr. Bruno's grading decisions were a pretext for disability discrimination. She concedes that Dr. Bruno was unaware of her disability throughout her clinical

---

conduct is a basis for dismissal. Nova's citation to Dr. Bruno's testimony adequately supports its statement that unauthorized absences or any one of the alleged instances of unprofessionalism alone were grounds for failure of a rotation. In the employment context, testimony of an employee's supervisor is evidence of whether a job function is essential. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007). The Court considers the testimony of a person with authority to evaluate the student to be analogous in the academic context as to grounds for failure. Given that Nova supports it contention with record evidence and Redding fails to controvert this fact in her response statement of facts, the Court deems this fact undisputed. *See* S.D. Fla. L.R. 56.1(b).

rotations. Therefore, Dr. Bruno's decisions could not possibly be motivated by Redding's disability. *See Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1295 (M.D. Ala. 2012) ("To the contrary, he has to show '*both* that the reason was false, *and* that discrimination was the real reason' why the employer fired him." (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 512 n.4 (1993))), *aff'd*, 550 F. App'x 748 (11th Cir. 2013); *cf. Axelrod v. Phillips Acad.*, 46 F. Supp. 2d 72, 83–84 (D. Mass. 1999) ("More importantly, however, this case is not about whether Phillips Academy correctly assessed Nicholas' ability to meet its academic requirements, but, rather, whether Phillips Academy discriminated against Nicholas on the basis of his ADHD."). Accordingly, Redding fails to raise a question of fact as to whether she failed to meet the program's essential requirements.

The next inquiry is whether Redding could have met the essential requirements if afforded reasonable accommodations. It is not the Court's obligation to speculate as to what reasonable accommodation would allow Redding to meet the essential requirements of the osteopathic medicine program. Rather, Redding has the burden of identifying such an accommodation. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (per curiam); *see also Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) ("The plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable."); *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1305 (S.D. Fla. 2013) (Rosenbaum, J.) (same). Redding fails to meet her burden of identifying a reasonable accommodation. Both Redding's complaint and summary judgment papers are devoid of any proposed reasonable accommodation that would allow her to meet the essential requirements of Nova's osteopathic medicine program.

Redding's request for accommodations regarding her make-up exams cannot be construed as requests for accommodations during her clinical semester. Redding requested accommodations

only in relation to the make-up exam policy, and it was incumbent on her to request additional accommodations if she sought accommodations related to the clinical rotation attendance policy. *See Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (per curiam) ("[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."). Indeed, the form that granted Redding's make-up exam accommodations, which Redding signed, specifically reminded her of this duty: "The granting of accommodations by the NSU Health Professions Division in no way guarantees that accommodations will be granted by outside entities (*rotation sites*, testing boards, etc.) and it will be the student's responsibility to request accommodations." (DE 68-2 at 28) (emphasis added). Accordingly, because Redding fails to meet her burden of identifying a reasonable accommodation, there is no genuine issue of material fact that Redding could not meet the essential requirements of Nova's osteopathic medicine program, even with a reasonable accommodation.

Largely because Redding fails in her burden to identify a reasonable accommodation, it is also unclear that any accommodation would be necessary. Though Redding claims that her absences were caused by her disability, her failure was not due to absences but rather *unauthorized* absences. *See Sedor v. Frank*, 42 F.3d 741, 746–47 (2d Cir. 1994) (noting distinction between absenteeism and unauthorized absenteeism). Redding presents no evidence that her Crohn's disease affected her ability to understand the attendance policies at issue and seek proper authorization for her absences. Had Redding complied with the attendance policies and then requested that more absences be excused than generally allowed, for example, the Court would have to consider whether such an accommodation is reasonable as part of its "qualified individual" inquiry. Redding's failure to seek authorization for any of her absences renders such an analysis unnecessary.

While the Court concludes that Nova is entitled to summary judgment on Redding's dismissal claims because there is no genuine issue of material fact that Redding was not "qualified" when she was dismissed, Nova is wrong that this is a basis for also granting summary judgment on Redding's failure-to-accommodate claims. Nova's argument for why Redding is not qualified is limited to Redding's actions during her clinical semester. Nova reasons that if Redding is unqualified for a part of its program, she is unqualified for the entirety of it and that it is entitled to summary judgment as to all of Redding's claims on this basis. The Court rejects this argument. Redding's failure to satisfy the "qualified individual" prong of her dismissal claims does not mean that she also fails to satisfy this element as to her failure-to-accommodate claims.

Disability discrimination includes more than just adverse actions, such as dismissal. A failure to provide reasonable accommodations is a distinct, actionable theory of discrimination under the ADA and the Rehabilitation Act. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1209, 1212 n.6 (11th Cir. 2008); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007). Redding's failure-to-accommodate claims arise from Nova's alleged failure to accommodate Redding *before* her clinical semester. Because the basis for these claims is the alleged denial of a requested accommodation, Nova's liability necessarily depends on whether Redding was a "qualified individual" at the time she allegedly requested, and Nova allegedly denied, the accommodation. *Gilks v. Pine State Trading Co.*, No. 1:12-CV-0046-NT, 2012 WL 2861015, at *3 (D. Me. July 10, 2012) ("The relevant point in time from which to review a plaintiff's status as an 'otherwise qualified individual' is when the plaintiff requests and is denied an accommodation, rather than any time after that."); *see also Miner v. D.C.*, 809 F.3d 66, 70 (D.C. Cir. 2015). Redding's later actions are irrelevant to this claim. Contrary to Nova's argument, Redding's later disqualification does not

preclude liability for prior wrongful denials of accommodations. Because Nova's only stated basis for asserting that Redding cannot meet the "qualified individual" element of her failure-to-accommodate claims is that Redding later became disqualified *after* the alleged denials of accommodations, Nova fails to meet its burden of establishing an absence of evidence that Redding was qualified at the time she requested accommodations for taking her make-up exams, and the Court considers these claims further.

### B. ADA Failure-to-Accommodate Claim

Redding's remaining claim under the ADA is for alleged failures to reasonably modify make-up exam policies during her preclinical years. Title III of the ADA does not provide a private cause of action for monetary damages; only prospective relief is available. *Jairath v. Dyer*, 154 F.3d 1280, 1283 & n.7 (11th Cir. 1998); *Ass'n for Disabled Ams., Inc. v. Concorde Gaming Corp. (Goldcoast Entm't Cruises)*, 158 F. Supp. 2d 1353, 1359 (S.D. Fla. 2001) (citing *Powers v. MJB Acquisition Corp.*, 993 F. Supp. 861, 867 (D. Wyo. 1998)). The Court's grant of Nova's motion for summary judgment as to Redding's dismissal claims means that Redding no longer has any claim for which readmission to Nova is an available remedy. So even if Redding were to prevail on her remaining ADA claim, she would not be able to enjoy the prospective relief that it affords.

As a result, Redding lacks standing to pursue her remaining ADA claim for alleged failures to modify make-up exam policies. "[T]o have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1283 (11th Cir. 2001). In the ADA context, this means a plaintiff seeking an injunction or declaratory judgment must show a real and immediate threat of future disability discrimination. *Shotz v. Cates*, 256 F.3d 1077, 1081–82

29

(11th Cir. 2001). As a dismissed student without a valid claim for readmission, Redding lacks

standing to pursue prospective relief. Accordingly, to the extent Redding's ADA claim is based on

alleged failures to reasonably modify policies rather than her ultimate dismissal, the Court will *sua*

*sponte* dismiss the claim for lack of subject-matter jurisdiction. *See Sheely v. MRI Radiology*

*Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007) (explaining that dismissal, not grant of

summary judgment, is proper when court disposes of claim on justiciability grounds).

### C. Rehabilitation Act Failure-to-Accommodate Claim

Unlike Title III of the ADA, monetary damages are available under the Rehabilitation Act.[23]

Nova raises several arguments as to Redding's failure-to-accommodate claim under the

Rehabilitation Act, none of which establish entitlement to summary judgment.

### 1. Whether Redding Failed to Request Accommodations Before October 2012

Nova claims Redding did not request accommodations until October 2012. Nova is correct

that a plaintiff must request an accommodation for a defendant to be liable under the Rehabilitation

Act. *Schwarz*, 544 F.3d at 1219 (citing *Wood*, 978 F.2d at 1222). But Nova's factual contention is

disputed. Redding testified that as early as 2009 she requested flexibility in rescheduling her make-

up exams and the opportunity to take them in the same format as the original exam. This raises a

factual issue regarding when Redding first requested accommodations.  Nova's real argument is that

Redding did not request accommodations pursuant to Nova's established procedure until October

---

[23] To prevail on a claim for monetary damages under the Rehabilitation Act, a plaintiff has the added burden of proving that the defendant's Rehabilitation Act violation was the result of intentional discrimination, which may be proven by showing that the defendant was deliberately indifferent to the plaintiff's statutory rights. *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344–45 (11th Cir. 2012). In its motion for summary judgment, Nova does not attack the "intentional discrimination" element of Redding's claim for monetary damages so the Court does not address it. The Court notes, however, that Redding will have to meet this higher standard to prevail at trial.

2012, when Redding submitted a formal request to the Office of Disability Services. It is unclear whether a student's failure to request accommodations via a formal procedure invalidates "informal" requests for accommodations. Nova cites one non-binding case that states, "Although a disabled student's disregard of written procedures can certainly be fatal to her subsequent discrimination claim, St. Thomas has not yet proven this is such a case." *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1231 (S.D. Fla. 2010). *Forbes* provides no authority or reasoning for its proposition that disregarding written procedures can be fatal to a failure-to-accommodate claim, and it is unclear how broadly the court intended its statement to apply.[24]

It is unnecessary to determine the validity or scope of this statement in *Forbes*, however, because there is an issue of fact as to whether Redding disregarded Nova's written procedures. While Nova claims that the procedures associated with requests for disability accommodations are detailed in its student handbook, the student handbook for the College of Osteopathic Medicine only refers to the university-wide disability procedures. (DE 68-10 at 9.) In turn, the university-wide student handbook states that accommodation requests must be made to the disability service representative of the student's specific school and that students must contact the university's ADA coordinator to obtain the contact information for their disability service representative. (DE 68-8 at 42.) Rather than disregard this procedure, Redding claims she contacted the ADA coordinator and was rebuffed. Assuming without deciding that the disregard of written procedures is fatal to a Rehabilitation Act claim, Redding raises a factual issue as to whether she disregarded Nova's written procedures.[25]

---

[24] The Court notes that the *Forbes* court said that disregarding written procedures *can be*, rather than always is, fatal. The use of indefinite, rather than absolute, language is telling.

[25] Furthermore, Dr. Whitehead violated Nova's policies by failing to refer Redding to the Office of Student Disabilities when she requested accommodations. And when Redding eventually tried to

### 2. Whether Nova Provided Reasonable Accommodations

Nova argues it reasonably accommodated Redding with extra time and bathroom breaks once she requested accommodations via its formal procedure. Nova fails to establish that these were reasonable accommodations.[26] Nova is correct that Redding was entitled to only a reasonable accommodation and not necessarily the accommodation of her choice. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285–86 (11th Cir. 1997). But for an accommodation to be reasonable it must be related to the accommodated person's disability. *Allen v. Interior Const. Servs., Ltd.*, 214 F.3d 978, 982 (8th Cir. 2000). Redding's condition caused frequent, unexpected exam absences. Extra time and bathroom breaks do not appear to relate to ameliorating this issue, and Nova fails to explain any correlation.

Nova urges the Court to defer to its decision that extra time and bathroom breaks is a reasonable accommodation. This was not an academic decision, however, and it is not entitled to deference. A determination of whether an accommodation is related to a disability involves no *academic* judgment and judicial review of such a decision does not offend principles of academic freedom. Nova cannot immunize all of its decisions from review by waving the flag of deference merely because it is an academic institution. *See Vanasco*, 137 F.3d at 968 ("Congress did not intend that institutions of higher learning enjoy immunity from the Nation's antidiscrimination statutes.").

---

contact her disability services representative, Mr. Ferrero, he never responded. Also, the record reflects that Redding received various accommodations via informal requests (including to Dean Silvagni), which could reasonably lead one to believe there was no required procedure. Under these facts, Redding cannot be faulted for making requests outside Nova's formal procedure.

[26] This argument also fails because Redding was not notified of these accommodations until February 19, 2013, so they cannot justify summary judgment for Rehabilitation Act violations before this date.

Also, Nova's claim that it based these accommodations upon the documentation provided by Redding's physician is open to factual dispute. The letter from Redding's doctor did not identify any recommended disability accommodations, and Redding's doctor wrote, "Please let me know if further details are needed." (DE 68-2 at 22.) There is no evidence that anyone from Nova ever followed up with Redding's doctor or advised Redding that her documentation was inadequate. To the contrary, Nova's documents raise an inference that it deemed Redding's requested accommodations as adequately supported by medical documentation and that the accommodations it chose to grant were not so supported. The initial Memorandum of Accommodation granting Redding's requested accommodations contained a paragraph stating: "Upon thorough review of the physician's evaluation, the student has submitted the documentation required by Nova Southeastern University's Student Disability's [sic] Office for the granting of the following accommodations . . . ." (*Id.* at 25.) This paragraph is conspicuously absent from the second Memorandum of Accommodation granting extra time and bathroom breaks. (*Id.* at 27.)

Moreover, the record is conflicting and undeveloped as to who made the decision to replace Redding's requested (and granted) accommodations with new accommodations and why Nova deemed extra time and bathroom breaks as reasonable. Taking the facts in the light most favorable to Redding, the accommodations ultimately granted to her were "standard" accommodations given to her without regard to her specific disability. And Nova's corporate representative even admitted that all students are entitled to bathroom breaks so this was not an accommodation at all. (DE 73-1,

Ex. G. at 117:2–15.) Accordingly, Nova fails to establish the absence of a factual dispute as to whether the accommodations it granted were reasonable.[27]

### 3. Whether the Requested Accommodations Would Unduly Burden Nova or Fundamentally Alter the Program

The Rehabilitation Act does not require a school to grant an accommodation if it would impose undue financial and administrative burdens or require a fundamental alteration in the nature of the program.[28] *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 n.17 (1987); *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 409–10 (1979). "Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Davis*, 442 U.S. at 413. Whether a proposed modification would impose an undue burden or require a fundamental alteration is generally a question of fact. *See Arline v. Sch. Bd. of Nassau Cty.*, 772 F.2d 759, 764–65 (11th Cir. 1985), *aff'd and remanded*, 480 U.S. 273; *Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 471 (6th Cir. 1993); *Alumni Cruises*, 987 F. Supp. 2d at 1305–06; *Long v. Howard Univ.*, 439 F. Supp. 2d 68, 76 (D.D.C 2006). This case is no exception.

Nova raises several reasons Redding's requested accommodations—(1) flexibility in rescheduling make-up exams and (2) the opportunity to take make-up exams in the same format as the original exam—would have either imposed an undue burden or required a fundamental alteration

---

[27] Nova's argument that Redding should have employed its appeal process if the accommodations were unreasonable is rejected. Other than when a federal employee sues a federal employer, it is well-established that plaintiffs suing under Section 504 of the Rehabilitation Act are not required to exhaust administrative remedies. *Freed v. Consol. Rail Corp.*, 201 F.3d 188, 194 (3d Cir. 2000); *Doe v. Garrett*, 903 F.2d 1455, 1460 (11th Cir. 1990); *Powers*, 993 F. Supp. at 866 (collecting cases); *Ali v. City of Clearwater*, 807 F. Supp. 701, 704 (M.D. Fla. 1992) (collecting cases).

[28] While the undue burden and fundamental alteration analyses are separate, the Court considers them together in this case because the same facts preclude summary judgment on each ground.

of the program. "The court is obligated to scrutinize the evidence before determining whether the defendant's justifications reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives . . . ." *Arline*, 772 F.2d at 764–65. Several facts sufficiently create a genuine dispute as to Nova's contentions.

Most importantly, on some occasions Nova permitted Redding to reschedule a make-up exam or take a make-up exam in the original format. This alone creates a question of fact as to whether these accommodations would impose an undue burden or require a fundamental alteration of the program. *See Wong*, 192 F.3d at 820 ("An institution's past decision to make a concession to a disabled individual does not obligate it to continue to grant that accommodation in the future, nor does it render the accommodation reasonable as a matter of law. The fact that the school previously made the exact modification for the Surgery and Medicine clerkships that Wong requested for the Pediatrics clerkship, however, is certainly persuasive evidence from which a jury could conclude that the accommodation was reasonable."); *Forbes*, 768 F. Supp. 2d at 1228 n.5 ("The fact that St. Thomas allowed Forbes (along with several other law students) to take exams with these benefits demonstrates that the accommodations did not impose an undue burden to the law school or undermine the school's teaching goals."); *Matthews v. NCAA*, 179 F. Supp. 2d 1209, 1226 (E.D. Wash. 2001) ("Most notably, the NCAA already has granted Plaintiff two waivers, including one waiver of the 75/25 Rule. The Court finds it difficult, particularly in light of the individualized inquiry required by Martin, to see how granting a third waiver to Plaintiff would fundamentally alter the NCAA's purpose, when the first two waivers did not."). Moreover, the Office of Disability Services granted Redding's requested accommodations, before they were (somehow) replaced. As

35

this office had the ultimate authority to grant an accommodation, even over the disagreement of a

dean, its imprimatur on Redding's requested accommodations creates a similar question of fact.[29]

### 4. Whether Redding's Requested Accommodations Were Necessary

Section 504 of the Rehabilitation Act "requires that an otherwise qualified handicapped

individual must be provided with meaningful access to the benefit that the [federal] grantee offers."

*Alexander v. Choate*, 469 U.S. 287, 301 (1985). "[T]o assure meaningful access, reasonable

accommodations in the grantee's program or benefit may have to be made." *Id.* Section 504 does not,

however, require accommodations "beyond those necessary to eliminate discrimination against

otherwise qualified individuals." *Davis*, 442 U.S. at 410. While the statute promises equal

opportunity, it does not guarantee equal results. *Alexander*, 469 U.S. at 304. Therefore, Section 504

requires only those accommodations that are necessary to ameliorate a disability's effect of

preventing meaningful access to the benefits of, or participation in, the program at issue. *Wisc. Cmty.

Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 748 (7th Cir. 2006) (en banc); *Fialka-Feldman v.

Oakland Univ. Bd. of Trs.*, 678 F. Supp. 2d 576, 583 (E.D. Mich. 2009); *see also Schwarz*, 544 F.3d

at 1220, 1226 (applying analogous "necessity" analysis in Fair Housing Act case and noting that

reasonable-accommodation analysis under FHA is same as under Rehabilitation Act).

Nova claims that no accommodations were necessary because Redding was ultimately able

to complete the first two years of the program and advance to the third, clinical year. The Supreme

court has explained that the Rehabilitation Act requires federal grantees to provide a qualified person

with a disability "*meaningful* access to the benefit that the grantee offers." *Alexander*, 469 U.S. at

---

[29] These are not the only facts in the record that refute Nova's undue burden and fundamental
alteration arguments, but these facts alone are sufficient for the Court to determine that summary
judgment is inappropriate.

301 (emphasis added). In *Alexander*, the Supreme Court cautioned that the "benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled." *Id.*

Implicit in Nova's argument is that meaningful particpation is mere advancement to the next academic year. Participation in an academic program cannot be defined so narrowly. Academic achievement is measured by more than pass/fail. Nova's argument deems delayed advancement equal to advancement and the value of a 'C+' average equal to an 'A' average. Meaningful participation and access to an academic program includes the *opportunity* to advance to the next academic year on the regular schedule and to achieve one's academic potential on a level playing field with one's peers. When a qualified student's disability prevents such meaningful participation, a reasonable accommodation cannot be called unnecessary.

Taking the facts in the light most favorable to Redding, Redding performed well on her exams when they were not make-up exams, the make-up exams were more difficult than the original exams, Redding took more make-up exams than the average student, and the rigidity of Nova's make-up exam policy affected Redding more negatively than others due to her Crohn's disease and actually caused her to take additional, harder make-up exams. There is a question of fact as to whether, if granted her requested accommodations, Redding would not have taken four years to pass two years of medical school. There is also a question of fact as to whether, under the make-up exam policy, Redding's disability inhibited her from reaching her academic potential on a level playing field with her peers and whether her requested accommodations would have ameliorated that inhibition. Furthermore, Redding's failures led her to suffer the ordeal of dismissal proceedings, which may not have occurred if granted her requested accommodations. It is also unclear whether

Redding had to pay Nova extra tuition as a result of being required to repeat courses. On this record, the Court cannot conclude as a matter of law that Redding's eventual advancement to the third academic year of Nova's osteopathic medicine program rendered accommodations unnecessary.[30]

Nova also appears to argue that no accommodations were necessary because its make-up exam policy applied uniformly to all students and there is no evidence that the make-up exam policy or format of the exams is discriminatory. It is difficult to see how this relates to the necessity of an accommodation. Even when a policy is applied uniformly, an individual's disability may limit meaningful access to the benefits of, or participation in, the program at issue. The absence of overt discrimination or animus is immaterial to a failure-to-accommodate claim. *See Forbes*, 768 F. Supp. 2d 1222, 1227 (2010) ("Disparate treatment involves discriminatory intent and occurs when a disabled person is singled out for disadvantage because of her disability. By contrast, a failure to make reasonable accommodations claim requires no animus . . . ."). Indeed, Redding concedes that Nova's make-up exam policy was applied to her the same way it was applied to all students (DE 68-1 ¶ 18), but she claims that the policy affected her more negatively because of her illness. (DE 70-2 at 100:25–101:10) ("If you look at one individual exam, yes, we were treated the same. If you look over the course of a semester, someone may be sick one time. I have to take ten make-up exams. Once make-up exam versus ten make-up exams. I entered second year with a B plus average. I finished second year with 69 percent.").

It is thus simply irrelevant that Nova's make-up exam policy was uniformly applied. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) ("By definition any special 'accommodation'

---

[30] Nova also argues that Redding's requested accommodations were unnecessary because it also offers a remediation exam and a make-up of the remediation exam. As noted *supra*, the record is conflicting and undeveloped as to the availability and academic consequences of these exams.

requires the employer to treat an employee with a disability differently, *i.e.,* preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach."); *Holly*, 492 F.3d at 1262–63 ("[T]he very purpose of reasonable accommodation laws is to *require* employers to treat disabled individuals differently in some circumstances-namely, when different treatment would  allow a disabled individual to perform the essential functions of his position by accommodating his disability without posing an undue hardship on the employer. Allowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement."); *Thomas By & Through Thomas v. Davidson Acad.*, 846 F. Supp. 611, 619 (M.D. Tenn. 1994) ("The Court cautions that blind adherence to policies and standards resulting in a failure to accommodate a person with a disability is precisely what the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973 are intended to prevent.").

Nova's final argument for lack of necessity applies to only Redding's request to take make-up exams in the same format as the original exam. Nova argues that Redding fails to connect her disability to this request. As noted *supra*, an accommodation is necessary only when it ameliorates the disability's effect of preventing meaningful access to the benefits of, or participation in, the program at issue. Here, Redding's Crohn's disease caused her to take more make-up exams than the average student. (DE 73-1, Ex. G 30:13–17.) There is also evidence in the record that the make-up exams were much more difficult than the original exams. Indeed, according to Redding, a Nova faculty member told her the make-up exams were "made to fail" and an administrator told her they were a "punishment." (DE 70-2 at 57:11–59:10, 60:1–6, 96:13–18, 99:20–100:2.) Redding's grades further corroborate her claim that the make-up exams were more difficult than the original exams,

as she did relatively well on the exams she took that were not make-ups.[31] Redding's disability

caused her to miss multiple exams and thus take an atypically large number of make-up exams. If

the make-up exams were much more difficult than the original exams, then the make-up exam policy

had a uniquely negative effect on Redding and she would not be able to compete with her peers on

a level playing field. Taking the make-up exam in the same format as the original exam might

ameliorate that negative effect. Thus, on this record, the Court cannot grant Nova summary judgment

on Redding's failure-to-accommodate claim under the Rehabilitation Act.

### IV. Potential Rule 11 Violation

"On its own, the court may order an attorney, law firm, or party to show cause why conduct

specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3). In the

"additional facts" portion of her response to Nova's statement of facts, Redding asserts, with

quotation marks, that Dr. Whitehead said, "There is no policy for accommodations, I'm not

accommodating you. You will be taking makeup tests." (DE 99 ¶ 102.) But on one of the same pages

of Redding's deposition that her counsel cited to support this assertion, Redding actually clarified:

"What I'm to testify to is I asked him for help, and he said, 'We can't give you help.' *He never*

*mentioned the word 'accommodation.'* . . . He just said, 'We can't help you.'" (DE 70-2 at

56:24–57:10) (emphasis added). Given Redding's deposition testimony (located on one of the same

pages that her counsel cited in support of the assertion in the response statement of facts), Redding's

assertion regarding Dr. Whitehead's statements in her response statement of facts appears to be a

misrepresentation of the record to the Court. The misquote is particularly significant given that this

---

[31] Of course, it may be that Redding is simply better at multiple-choice exams or struggles with written exams. But on summary judgment the Court must construe all inferences in Redding's favor.

is primarily a failure-to-accommodate case. Redding's counsel must therefore show cause as to why this conduct did not violate Rule 11(b)(1) or (b)(3).

### V.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Nova's Motion for Summary Judgment (DE 68) is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to Redding's ADA and Rehabilitation Act claims arising from her dismissal from Nova. Redding's remaining claim under Title III of the ADA is **DISMISSED** for lack of subject-matter jurisdiction. Nova's motion is **DENIED** as to Redding's remaining failure-to-accommodate claim under the Rehabilitation Act.

It is further **ORDERED AND ADJUDGED** that Plaintiff's counsel shall **SHOW CAUSE** within ten days of this Order as to why the conduct described in Part IV of this Order did not violate Rule 11(b)(1) or (b)(3). Nova may respond within ten days of Plaintiff's response to this Order.

**DONE AND ORDERED** in chambers at West Palm Beach, Palm Beach County, Florida, this 25th day of February, 2016.

_____
KENNETH A. MARRA
United States District Judge